**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **UNITED STATES OF AMERICA,** |
| **Plaintiff,** |
| **v.** |
| **PROJECT ON GOV'T OVERSIGHT, et al.,** |
| **Defendants.** |

Civil Action No.  03-0096 (JDB)

<u>**MEMORANDUM OPINION**</u>

The Project on Government Oversight ("POGO") is a self-described "independent nonprofit that investigates and exposes corruption and other misconduct in order to achieve a more accountable federal government." <u>See</u> POGO -- About Us, http://www.pogo.org/p/x/aboutus.html.  On November 2, 1998, POGO paid Robert Berman, a senior economist at the Department of the Interior ("DOI"), a sum of $383,600 in recognition of his dedicated "public service."  That payment consisted of a portion of the proceeds that POGO had received in connection with settlement of a *qui tam* case involving oil royalty collection, in which POGO had been a relator.  Sensing impropriety, the United States filed suit against both POGO and Berman, claiming that they had violated 18 U.S.C. § 209(a), which prohibits private parties from making, and government employees from receiving, payments that compensate civil servants for their government service.  Currently before the Court are two motions for summary judgment.  The first was filed by the United States and is opposed by both defendants.  The

1

second was filed by defendant Berman, and is opposed by the United States.  For the reasons set

forth below, the Court will deny both motions.

## BACKGROUND

The facts of this case are set out in detail in both United States v. Project on Government

Oversight, 454 F.3d 306 (D.C. Cir. 2006) ("POGO I"), and United States v. Project on

Government Oversight, 484 F. Supp. 2d 56 (D.D.C. 2007), and briefly recounted here.

Interestingly enough, although the parties bitterly dispute the proper factual characterization, the

operative events of this case are not substantially in dispute.  At all relevant times, Robert

Berman was employed as a senior economist in the DOI.  Pl.'s Stmt. of Material Facts ¶ 2.  In

particular, Berman was assigned to the Office of Policy Analysis within DOI.  Id. ¶ 36. During

the early 1990's, POGO began "investigating the oil industry's underpayment of royalties" to the

federal government and certain American Indian tribes that are lawfully entitled to such

payments under federal law when oil is removed from their land.  Id. ¶ 17.  DOI is the federal

agency charged with collecting those royalty payments.  Pl.'s Mot. for Summ. J. (hereinafter "Pl.'s

Mot.") Ex. 27 at 2.  It is the relationship that POGO forged with Berman during the course of that

investigation that lies at the center of this lawsuit.

While studying royalty issues, Danielle Brian, POGO's Executive Director, came across

her "first 'good document'" in June, 1994 -- a "memorandum prepared by Mr. Berman and leaked

to her."  Pl.'s Stmt. of Material Facts ¶ 25.  For his part, Berman had been advocating the use of

the New York Mercantile Exchange crude oil price -- as opposed to the allegedly less accurate

spot industry posted prices -- for royalty valuations since as early as 1986.  Id. ¶ 38.  Berman's

efforts, however, were "opposed by the MMS [the Mineral Management Services office within

DOI] and . . . never adopted."  Def. Berman's Opp'n at 9.  Moreover, Berman maintains that

"substantially before POGO filed its *qui tam* action" he was asked by his supervisor to cease his

work on "royalty issues."  Id. at 8.  Berman's frustration aside, during the course of 1995 Brian

had several conversations with Berman in which he explained to her the mechanics of the

transactions employed by the oil industry.  Pl.'s Stmt. of Material Facts ¶ 26.  Those

conversations, according to the United States, "later formed the basis for the *qui tam* litigation."

Id.

   POGO's efforts ultimately culminated in issuing four investigative reports and filing two

*qui tam* lawsuits in 1997 in the United States District Court for the Eastern District of Texas.  Id.

¶¶ 3, 17.  Significantly, one of those investigative reports, entitled "Drilling for the Truth: More

Information Surfaces on Unpaid Oil Royalties," is "carefully footnoted" and contains citations to

memoranda written by Berman.  Id. ¶ 18; Def. POGO's Stmt. of Material Facts ¶ 18.  Before

filing the *qui tam* actions, on December 9, 1996 Brian expressed to the POGO Board of Directors

that if the organization prevailed in the putative litigation, she wanted a portion of the proceeds

to go to Berman.[1]  Pl.'s Stmt. of Material Facts ¶ 19.  Around that same time, Berman

participated in some capacity in a proposed rulemaking "governing valuation for oil royalty

purposes."  Id. ¶ 27.  In that role, the United States maintains that Berman, as the "principal

author . . . drafted a memorandum to the director of MMS" that made suggestions to "ensure that

the pending *qui tam* litigation would not be jeopardized."  Id. ¶¶ 28-29.  In substance, the

memorandum recommended that the rulemaking clarify that the existing regulations already

---

[1] In fact, Berman had previously declined POGO's invitation to serve as a co-relator in the *qui tam* cases.

permitted DOI to employ market-based royalty assessments.

POGO and Berman vigorously dispute the insidious characterization of Berman's role in drafting that document.  Berman first insists that he drafted the memorandum in conjunction with Mr. Bettenberg, then the acting Director of the OPA, and that the two were "co-drafter[s]."  Def. Berman's Opp'n at 4-5.  In addition, Berman rejects the notion that he was motivated by a desire to preserve his interest in the *qui tam* litigation, but rather argues that he made the suggestions to reflect "the self-evident point . . . that DOI was already pursuing cases in which it was arguing that existing regulations entitled it to royalties based upon market values and not posted prices, and it was in the federal government's interest not to draft a document that could be used" by the oil companies to undermine DOI's current position.  Id. at 5.  Moreover, he also maintains that the same flaw in the original draft was "identified at the meeting" in which he received the assignment and thus he and Bettenberg "were simply executing their assignment in a manner that was consistent with their instructions."  Id.  Furthermore, Berman points out that the position he "clarified" in the draft was the very same position that he had been advocating since 1986, well before he had any conceivable monetary interest in any *qui tam* litigation.  Id. at 5-6.  Finally, he notes that the edits in question were made before POGO filed the relevant *qui tam* suits.  Id. at 6. For its part, POGO adds that it was "actively pushing for the rule change" despite its potentially adverse impact on the outcome of its litigation.  Def. POGO's Stmt. of Material Facts ¶ 32.

In any event, in accordance with the decision at the December 1996 Board meeting, POGO and Berman entered into a written agreement on January 5, 1998 that provided that Berman would receive a one-third share of any monetary award that POGO may secure pending the outcome of the litigation.  Id. ¶ 13.  On February 18, 1998, the United States intervened in the

4

*qui tam* proceedings, and beginning in August of that year entered into a series of settlement agreements with the oil company defendants that ultimately resulted in a recovery of $440 million and "a relators' share of more than $67 million."[2]  Id. ¶¶ 7-8.  POGO received its first installment payment of its relator proceeds in October of 1998.  Id. ¶ 15.  After consulting with a "Constitutional attorney," POGO delivered a check in the amount of $383,600 to Berman; the accompanying cover letter indicated that it was an "award for public service" and the check itself identified the payment as a "Public Service Award."  Id.  ¶¶ 15-16.

Berman's receipt of that award set off a series of events involving these parties, including a congressional hearing and a criminal investigation, the ultimate result of which events is the instant litigation.  Pl.'s Stmt. of Material Facts ¶ 24.  In January 2003, the United States filed suit against POGO and Berman alleging that they had both violated 18 U.S.C. § 209(a) by making and receiving, respectively, the public service award.  The United States moved for summary judgment, and the district court granted that motion, explaining in its brief order that the decision was based "'substantially [upon] the reasons set forth in Plaintiff's memorandum in support.'" POGO I, 454 F.3d at 308.  The district court then certified the decision for immediate interlocutory appeal.  Id.

POGO promptly appealed that decision and the D.C. Circuit ultimately ruled in its favor in POGO I.  The court first explained that § 209(a) does not "'prohibit payment for services rendered exclusively to private persons or organizations . . . which have no connection with the services rendered to the Government.'"  Id. at 309 (quoting United States v. Muntain, 610 F.2d

_____

[2] POGO's *qui tam* actions were consolidated along with two additional lawsuits filed by separate relators that raised substantially the same allegations.  Pl.'s Stmt. of Material Facts ¶¶ 4-6.

964, 970 n.5 (D.C. Cir. 1979)) (emphasis added). Instead, § 209(a) is only violated when there is an "'intentional, direct link between the outside compensation and the employee's government service.'" Id. (quoting Application of 18 U.S.C. § 209 to Employee-Inventors Who Receive Outside Royalty Payments, Op. Off. Legal Counsel, U.S. Dep't of Justice, 2000 WL 33952879 (Sept. 5, 2000)). Thus, as the court saw it, the crucial issue before it was not simply whether POGO paid Berman any sum of money (which it undeniably did), but whether the public service award was rendered to him in connection with his government service. Id. at 310.

The United States maintained that "POGO paid Mr. Berman because of the work he had done for Interior and for his assistance to POGO in connection with that work." Id. (internal citations omitted). POGO, on the other hand, characterized the payment "not as compensation for Berman's government work, but . . . [as] recognition of whistle-blowing that assertedly was outside the scope of that work." Id. (emphasis added). The government's case against Berman and POGO was "strong," the court reasoned, but not appropriate for summary disposition. Id. at 313. Specifically, POGO maintained that "it neither said nor meant . . . [to] compensate[] [Berman] for his government work." Id. at 312. Instead, according to POGO, "as referenced in the Board minutes, transmittal letter, and draft press release," the public service award was given to Berman for "work as an 'internal whistle-blower who went well beyond his official duties to defend the taxpayers' interests.'" Id. The D.C. Circuit held that because so "much of POGO's defense hinges on the credibility of Berman and Brian," the district court erred in granting summary judgment because a court cannot make such credibility determinations at the summary judgment stage. Id. at 313. Consequently, the court could not "say that 'no reasonable jury could

6

return a verdict for POGO.'" Id.  The case was therefore remanded for further proceedings.[3]

By the time of the D.C. Circuit's opinion, the original district judge had retired and the case was consequently reassigned to the undersigned judge on remand.  POGO then moved to dismiss on statute of limitations grounds, which this Court denied.  See United States v. Project on Gov't Oversight, 484 F. Supp. 2d 56.  A trial date was then set.  Now, citing "new" evidence that allegedly eliminates the credibility issues that the D.C. Circuit identified, the United States has again moved for summary judgment against both defendants.  Defendants oppose that motion, and POGO adds two affirmative defenses that, in its view, also preclude summary judgment.  Berman, who did not join in POGO's appeal, has moved for summary judgment in his own right.  Section 209(a), he argues, does not apply to lump-sum payments as a matter of law.  Thus, despite any factual disputes that may exist, Berman maintains that he is nevertheless entitled to summary judgment on that basis.  The Court will now address to each motion in turn.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions

---

[3] The D.C. Circuit explicitly did not decide any of the other issues raised on appeal: "Although the parties raise a host of additional issues, we have no reason to reach them."  POGO I, 454 F.3d at 313.

of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

fact." Id. (quoting Fed. R. Civ. P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude

summary judgment, the court must regard the non-movant's statements as true and accept all

evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the

"mere existence of a scintilla of evidence" in support of its position. Id. at 252. By pointing to

the absence of evidence proffered by the non-moving party, a moving party may succeed on

summary judgment. Celotex, 477 U.S. at 322. "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50

(citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence

on which the jury could reasonably find for the [non-movant]." Id. at 252.

## DISCUSSION

### I. United States' Motion for Summary Judgment

To support its second motion for summary judgment, the United States argues that new

evidence alleviates the concerns raised by the D.C. Circuit in POGO I. In particular, the

government maintains that "*both* defendants" now admit that "POGO paid, and Mr. Berman

received, $383,600 for the internal Government whistleblowing represented within the

Department of Interior documents authored by Mr. Berman." Pl.'s Mot. at 1 (emphasis in

original). Moreover, the United States argues, because it is now "clear . . . that POGO relied on

Mr. Berman's Government work product in these investigations," the government insists that

"POGO can no longer assert . . . that Mr. Berman's whistleblowing was outside the scope of his Government service." Id. at 4-5.  Simply put, according to the government "[t]here remain no issues of credibility to be resolved." Id. at 1.

POGO and Berman, however, cast the government's motion in a different light. According to POGO, the "Government's second motion for summary judgment is a rehash of its first, with reliance upon alleged 'new evidence' that is neither new nor impactful on the decisive question." Def. POGO's Opp'n (hereinafter "POGO Opp'n") at 4.  While the United States makes much of the memoranda written by Berman and cited by POGO in its investigative reports, POGO and Berman insist that "[p]urported reliance upon Mr. Berman's whistlebowing [sic] material does not establish that POGO provided, or Mr. Berman received, the award as compensation for his work as a Government employee." Id. at 2.  Under their view, despite the government's allegations that "Mr. Berman's material on the oil royalty issue was Government work product," that issue is a question of fact that must be resolved by a jury. Id. at 15 n.11. Berman also maintains that the United States has consistently overstated his role in oil royalty issues at DOI.  Def. Berman's Opp'n at 8-10.

*a. The POGO I Factors*

In POGO I, the D.C. Circuit cited several factors that led the court to hold that there were factual issues in dispute that precluded summary judgment.  The government now aims to show that each of those issues has been resolved by additional discovery and "new evidence" in this case.  At the outset, the D.C. Circuit pointed out that Berman declared that the government's "depiction of his Interior Department responsibilities" was false; indeed, he maintained at the time that he had no "'programmatic authority or responsibility over oil pricing policies or royalty

collection policies at [Interior].'" <u>POGO I</u>, 454 F.3d at 311.  Moreover, contrary to the

government's assertions, Berman also denied that he "'served on the Interagency Taskforce . . . on

oil prices and oil royalty collection.'" <u>Id.</u>  More broadly, Berman asserted that "he did study oil

pricing and royalties collection policies from 1986 to 1987, [but] he did so on his own initiative

and, impliedly, not as part of his government responsibilities." <u>Id.</u>

     Against that backdrop, the United States now insists that Berman can no longer support

those claims that were essential to the D.C. Circuit's ruling.  To begin with, the government

dismisses Berman's statement that he had no programmatic authority over oil issues as "true only

in the narrow sense that he did not have ultimate decision-making authority."  Pl.'s Mot. at 16.

According to the government, Berman did in fact "analyze, recommend, discuss, and advise" on

oil royalty issues as evidenced by the "documents POGO footnotes."  <u>Id.</u>  Ultimate decision-

making authority, the government insists, "is irrelevant to § 209."  <u>Id.</u>  But surely the D.C. Circuit

did not regard that factor as entirely irrelevant; indeed, it expressly listed it as part of the body of

"evidence that contradicts" the government's proof.  <u>POGO I</u>, 454 F.3d at 311.  Although the lack

of ultimate decision-making authority is not dispositive for purposes of § 209, and may not even

be especially strong evidence at that, "[a]t 'the summary judgment stage[,] the judge's function is

not himself to weigh the evidence and determine the truth of the matter but to determine whether

there is a genuine issue for trial.'" <u>Id.</u> at 313 (quoting <u>Anderson</u>, 477 U.S. at 249).

     Next, the government argues that it is "irrelevant whether Mr. Berman's pursuit of royalty

issues began on his own initiative or at the direction of his superiors."  Pl.'s Mot. at 16.  Instead,

the only pertinent fact here, according to the United States, is that "Mr. Berman's superiors

believed the issue to be sufficiently important and within the scope of Mr. Berman's official

duties [so] as to read his memoranda and give them broader distribution within Interior."  Id.
Here again, however, the United States runs head-first into POGO I: the D.C. Circuit considered
whether Berman pursued his studies "on his own initiative" as part of an "independent
undertaking that was not part of his official responsibilities" to be relevant to the § 209 inquiry.
POGO I, 454 F.3d at 311-12.  In fact, the court devoted an entire paragraph to that discussion.
Id.

Moving along, the government now concedes that Berman was not assigned to the
interagency task force, but it maintains that the issue "is resolved without consequence" because
Berman was told to keep "his supervisor apprised of the activities of the task force."  Pl.'s Mot. at
16.  But the fact that Berman was not personally assigned to the task force, despite his apparent
interest in the subject matter, may be probative of the extent of Berman's official responsibilities
in that area.  That is, it may reflect that Berman was not in fact professionally responsible for oil
royalty issues.  Again, although that evidence may not be very strong, it is still evidence
nonetheless.

One significant development since the first summary judgment motion does indeed cut in
the government's favor.  The D.C. Circuit explained that Brian testified that Berman had
"checked with his ethics officer" and been cleared to receive the payment.  454 F.3d at 311 n.5.
That fact, the court reasoned, was evidence that DOI "did not view Berman's official work as the
same as or similar to that for which he was being rewarded by POGO."  Id.  Similarly, the court
also believed that it confirmed "POGO's understanding . . . that the work was different."  Id.  It is

now apparent, however, that Berman did not in fact consult his government ethics officer.[4]  Def.

Berman's Opp'n at 7 ("Mr. Berman does not dispute that he did not contact his ethics officer

concerning his acceptance of the award from POGO.").  Not only does the government argue that

the D.C. Circuit's reliance on this point is now moot, it also asserts that the fact that Berman did

not seek advice from his ethics officer suggests that he had some degree of awareness that he was

being compensated for his government service.  Pl.'s Mot. at 14.  Berman disputes that

characterization of his actions, explaining that he did not pursue that path because he feared he

would not get objective advice from Brooks Yeager, who was evidently the compliance officer at

the time.  Def. Berman's Opp'n at 7.  In any event, the government is correct that Berman and

POGO can no longer rely on this fact, which was cited by the D.C. Circuit, for any support.  But

that is not fatal to their case.  The entirety of the ethics officer discussion in POGO I is contained

in a single footnote; the D.C. Circuit's decision certainly did not turn on the ethics officer

passage.  To be sure, the government's case is now marginally stronger, but this fact alone is not

dispositive.

    Another fact referenced by the POGO I opinion is that Berman testified before Congress

at Brian's urging.  The government claims that even if true, "this fact is irrelevant." Pl.'s Mot. at

18.  The Court disagrees.  To begin with, once again, the D.C. Circuit expressly referenced that

fact in its discussion of defendants' case, which indicates that the court believed it had some

relevance to the disposition of the case.  POGO I, 454 F.3d 312.  Moreover, the government's

assertion that this fact is "irrelevant" is also incorrect as a matter of substance.  If, in fact, DOI

---

[4] Brian, for her part, still "unequivocally" maintains that "Mr. Berman had informed her that he had checked with his ethics officer, and that the ethics officer had informed Mr. Berman that Mr. Berman could accept the monetary award."  POGO Stmt. of Material Facts ¶ 34.

had instructed Berman to testify on oil royalty matters, that would be a strong indication that his official duties included dealing with such issues. By establishing that Brian, and <u>not</u> DOI, prompted Berman's congressional testimony, defendants will effectively rebut that inference.

    *b. The Scope of Berman's Official Duties*

    Aside from the specific factual issues referenced by the <u>POGO I</u> opinion, perhaps the most vigorously disputed issue in this case is the more general question of the scope of Berman's official duties with respect to oil royalties. The government maintains that "[t]hrough the end of 1996 . . . oil was very much a part of Mr. Berman's portfolio, with the knowledge, approval, and at the direction of his supervisors." Pl.'s Mot. at 10 n.7. The government's briefs are replete with references to Berman's internal "work product" that POGO would later use as a foundation for its investigative reports and *qui tam* suits. The underlying supposition is that if Berman prepared these reports on the job -- regardless of whether he did so on his own initiative -- and forwarded them to his superiors for discussion and analysis, those memoranda constitute his government service within the meaning of § 209(a). Thus, to the government at least, any claim by POGO or Berman that his "internal whistleblowing" was outside the scope of his government service must be disregarded in light of the irrefutable fact that Berman's memoranda -- which, it bears repeating, he circulated within OPA -- were relied upon by POGO.

    The government also strenuously maintains that oil royalties issues fall well within Berman's official job responsibilities. As the United States would have it, "[t]he role of the Office of Policy Analysis is to comment, advise, and make recommendations on programs throughout the agency." Pl.'s Reply at 15 n.15. In that regard, one of Berman's "many assignments . . . included '[m]onitor[ing] issues regarding royalty valuation of crude oil.'" <u>Id.</u>

Indeed, during this case, the government has referred to Berman as the "lead analyst in the office on oil royalty valuation issues."  See POGO I, 454 F.3d at 310.

There is admittedly much force to the government's position.  Berman, however, vigorously disputes the government's characterization of his official duties, and he cites a litany of facts to support his view.  To begin with, he claims that well before POGO filed its *qui tam* suits, his supervisors directed him not to work on royalty issues anymore.  Def. Berman's Opp'n at 8.  In fact, Berman has produced evidence that demonstrates that he was distressed that he was not adequately involved in the royalty settlement negotiations, and that he was "becoming increasingly intense in expressing his complaints about the substance of the settlements that he was hearing about second-hand."  Id. at 10 (emphasis added).  Moreover, Berman argues that high-ranking members of DOI "testified before Congress that Berman was not involved in drafting the first proposed oil valuation rule, nor did he participate in subsequent rule revisions." Id. at 9.  In his deposition testimony, Berman further stated that OPA plays no role in oil royalty settlements, and that his motivation in raising his complaints and suggestions to his superiors was to enable them to "[t]ake it upstairs . . . . to people who could . . . do something about it."  Pl.'s Mot. Ex. 34 at 6.  In addition, he also claimed that he voiced his objections because he believed the "settlement actions . . . were troublesome" although they had "nothing to do with anything I was doing at the time."  Id. Ex. 34 at 12.  Although Berman admittedly advocated for granting OPA a role in the valuation issue, he believed that it would be limited to helping MMS achieve a "general understanding . . . of market processes generally."  Id. Ex. 34 at 15.  In conclusion, he states that the government's "description of [him] as 'Interior's lead analyst on oil royalty valuation issues' . . . is at best misleading."  Def. Berman's Opp'n at 10.

14

These points establish a genuine issue of material fact concerning the scope (if any) of Berman's official responsibilities concerning royalty matters.  A jury could credit Berman's testimony that he himself played no role on oil issues but instead merely sought to flag the issues for his supervisors on his own initiative.  Moreover, a jury may also find POGO's assertions that it was compensating Berman for whistleblowing unrelated to his official government work to be credible.  In light of the government's evidence, defendants may indeed face a steep hurdle, but as the D.C. Circuit put it, "'the need to assess the credibility of witnesses is precisely what places this dispute outside the proper realm of summary judgment.'" POGO I, 454 F.3d at 313 (quoting Washington Post Co. v. U.S. Dep't of Health & Human Servs., 865 F.2d 320, 326 n. 8 (D.C. Cir. 1989)).

Perhaps the strongest point in defendants' favor is that the purported work product that the government now maintains conclusively resolves this case in its favor was in fact part of the initial summary judgment record.  Indeed, in POGO's view, the government has raised no new evidence in its second motion: "[T]his information has been publicly available since 1998.  In fact, from that time until today POGO has consistently confirmed -- and the Government has repeatedly acknowledged -- that POGO utilized some of Mr. Berman's papers to support its investigation and reports."  Def. POGO's Opp'n at 10.  Tellingly, with respect to POGO's use of Berman's memorandum, POGO observes that it "referred to that same document not once, but twice" in its exhibits to POGO's "*first* summary judgment motion." Id. at 11 (emphasis in original).  In sum, POGO argues that "the Government, this Court, and the appellate courts have been aware that POGO used some of Mr. Berman's writings since the commencement of this case." Id.  At the very least, POGO insists, the government cannot now use those documents "as

the basis for any claim that the factual record on that issue is different from when the court decided <u>POGO I</u>."  <u>Id.</u>

POGO is correct on this point.  In fact, the D.C. Circuit expressly recognized that POGO had made use of Berman's memoranda: "It was during this period that Berman wrote the <u>internal</u> memorandum later obtained by POGO."  <u>POGO I</u>, 454 F.3d at 311 (emphasis added).  The government responds that "it defies reason to argue" that Berman's memoranda do not constitute his government work product and that "[t]here is simply no way to separate Mr. Berman's internal whistleblowing from his Government service."  Pl.'s Reply at 13, 15.  Unfortunately for the United States, however, the D.C. Circuit has already disagreed with that assessment; in fact, that court quite plainly found that there was a "genuine dispute" as to whether "POGO paid Berman as compensation for his services as a government employee."  <u>POGO I</u>, 434 F.3d at 313.  The government has not offered any additional information that would enable this Court to decide otherwise on a resurrected motion for summary judgment.

In sum, the government attempts to dismiss many of the facts that the D.C. Circuit considered relevant when it held that summary judgment was inappropriate.  The United States is free to disagree with that court's decision, but this Court cannot permit the government simply to re-litigate those issues here.  It goes without saying that <u>POGO I</u> is binding precedent on these proceedings.  The government has produced no additional evidence (relative to its first motion for summary judgment) of significance that decisively refutes the competing evidence and characterizations offered by defendants.  To be sure, the government's case against defendants remains strong; indeed, it has only been strengthened by the loss of the ethics officer compliance evidence.  But in <u>POGO I</u>, the D.C. Circuit explained that much of defendants' case "hinges on

16

the credibility of Berman and Brian."  454 F.3d 313.  That remains true, particularly with respect

to a critical issue in this case: the nature and scope of Berman's employment responsibilities

concerning oil royalty valuations.  As the D.C. Circuit has found, such credibility determinations

are within the province of the jury, and accordingly this Court will deny the government's motion

for summary judgment.[5]

## II. Berman's Motion for Summary Judgment

Seizing on a concurring opinion signed by three Supreme Court Justices, Berman has

moved for summary judgment on the ground that § 209 does not apply to lump sum payments as

a matter of law.  Naturally, the government disagrees with that reading of the statute.[6]  If the

Court were to find that § 209 applies only to periodic installment payments, the government

argues, the entire statutory scheme of § 209 would be eviscerated.

At the outset, Berman notes that for purposes of his motion certain facts are not in

---

[5] In light of this conclusion that there are genuine issues of material fact that preclude summary judgment, the Court does not reach the additional arguments and defenses raised by the parties.  In particular, the Court expresses no opinion today concerning whether § 209, as POGO would have it, includes an element of intent.  Moreover, because POGO has not moved for summary judgment on its two affirmative defenses, the Court need not address those questions either.

[6] The government also argues that the law of the case doctrine bars Berman from raising this argument now.  Pl.'s Berman Opp'n at 6.  According to the United States,"it is clear from the [motion] hearing preceding the [initial district court] order that the dispositive issue was the legal issue of whether 18 U.S.C. § 209(a) reaches lump sum payments."  Id.  Because Berman did not appeal that initial order granting summary judgment, the government contends, he is precluded from making his argument at this juncture because the law of the case doctrine prohibits re-litigation of issues "'decided by necessary implication.'"  Id. (quoting Adair v. Winter, 451 F. Supp. 2d 210, 214 (D.D.C. 2006)).  Given that the Court concludes that Berman's argument fails on the merits in any event -- not to mention the fact that the district court's initial decision was reversed by the D.C. Circuit -- this Court need not decide whether the law of the case doctrine applies here.

dispute, most significantly that he was (and still is) a member of the executive branch when he received a lump-sum payment from POGO.  Berman then hangs his entire motion on a concurring opinion in <u>Crandon v. United States</u>, 494 U.S. 152 (1990).  There, a six-Justice majority of the Supreme Court held that § 209 has an important temporal element: payees must be employed by the federal government when they receive the payment in question.  <u>Id.</u> at 168.  Thus, the Court concluded, the defendants in <u>Crandon</u>, who had received severance payments from the Boeing Company before departing the corporation for government service, did not violate § 209 by accepting those payments.  <u>Id.</u> 154-55.

Justice Scalia, joined by Justice O'Connor and Justice Kennedy, also found no violation of the statute for a different reason.  Drawing on the distinction between "salary" and "compensation," Justice Scalia's textual analysis led him to conclude that § 209 only prohibits payments made "<u>periodically</u> during the term of federal service."[7]  <u>Id.</u> at 168-69 (emphasis added).  Because the defendants received only lump-sum payments prior to assuming their government positions, § 209 was not offended.  <u>Id.</u> at 175.

---

[7] Section 209(a), in relevant part, provides as follows:

Whoever receives any salary, or any contribution to or supplementation of salary, as compensation for his services as an officer or employee of the executive branch of the United States Government, of any independent agency of the United States, or of the District of Columbia, from any source other than the Government of the United States, except as may be contributed out of the treasury of any State, county, or municipality; or Whoever . . . pays, or makes any contribution to, or in any way supplements the salary of, any such officer or employee under circumstances which would make its receipt a violation of this subsection . . . Shall be subject to the penalties set forth in section 216 of this title.

Although it is a gross oversimplification, the main thrust of Justice Scalia's argument is that § 209(a) is keyed to "salary," and thus the phrase "contribution to or supplementation of" modifies only "salary" and <u>not</u> "compensation" more broadly.  Since "salary" refers to periodic payments, Justice Scalia concludes that § 209(a) applies solely to those and not to lump-sum payments.

That interpretation of § 209 forms the foundation of Berman's motion for summary judgment. Justice Scalia's reading of the statute, according to Berman, makes clear that "§ 209(a) applies only to ongoing, periodic payments known as 'salary,' which the statute distinguishes from the term 'compensation.'" Def. Berman's Mot. for Summ. J. (hereinafter "Def. Berman's Mot.") at 9. Since Berman received only a single lump-sum payment from POGO, the argument goes, he has not triggered the application of § 209(a).

The government responds with two principal arguments, the first based on the text of the statute and the second based on statutory purpose. To begin with, Justice Scalia's interpretation of the statutory text of § 209(a) is simply wrong, according to the government. As the United States would have it, "'any' contribution or supplement to salary means what it says, any contribution or supplement, not just those made periodically." Pl.'s Berman Opp'n at 11. "[C]onstruing § 209(a) to prohibit only periodic, salary-like payments," the government maintains, "tortures the meaning of 'contribution' and 'supplement.'" Id. In support of its argument, the government cites to other provisions of section 209 -- most notably, sections 209(b), (e), and (f) -- that "carve out exceptions [from liability] for . . . one-time payments" for relocation expenses, proceeds from certain types of insurance, and contributions made to certain charities. Id. These exceptions, the government maintains, confirm that § 209(a) must cover lump-sum payments as a general matter otherwise the carve-out exceptions would be reduced to mere surplusage. Id. at 12-13.

This is a compelling argument and Berman does not have a ready answer to it. Indeed, as the government correctly points out, "Justice Scalia himself recognized this as a weakness in his reasoning," although he did attempt to explain the discrepancy as "at most . . . an ambiguity." Id.

at 13; see 494 U.S. at 174.  In any event, the government's textual reading is more persuasive as a matter of statutory construction.

The government also maintains that Berman's proposed interpretation of the statute would be ruinous to its established purpose.  In Crandon, the majority held that "§ 209 is a prophylactic rule that aims at the source of Government employees' compensation."  494 U.S. at 159.  The government forcefully argues that if § 209(a) is not applied to lump-sum payments, that prophylactic scheme would be easily evaded; indeed, such an interpretation would provide a blueprint for an end-run around the application of § 209(a).  More specifically, the government points out that this sort of one-time payment implicates all of the "three basic concerns" -- the economic hold that an outside payor could have over a government employee, the employee's possible favoritism towards the payor even in the absence of direct pressure, and the "unwholesome appearance" generated by such payments -- identified in Crandon as underlying § 209(a).  See 494 U.S. at 165 (citing Association of the Bar of the City of New York, Conflict of Interest and Federal Service 211 (1960)).  In response, Berman argues that there is "no legitimate (i.e., non-speculative) basis whatsoever to infer that POGO and Mr. Berman have engaged in any practice that is contrary to Mr. Berman's obligations to his employer or that has advanced the interests of POGO over those of his own employer."  Def. Berman's Mot. at 23.  That argument, however, misses the point.  It overlooks the fact that § 209(a) is a prophylactic rule: the contention that there was no impropriety on this particular occasion, then, is simply irrelevant.  In any event, the Court is persuaded that the stated purpose of § 209(a) is better served by finding that lump-sum payments fall within it.

Berman's argument, however, suffers from another defect: he points to no authority to

support his proposition.  Neither before nor after <u>Crandon</u> has any court held that § 209(a) does not apply to lump-sum payments.  Tellingly, Justice Scalia was only able to muster two additional votes in favor of his interpretation.  Although his concurring opinion is not necessarily inconsistent with the majority's reasoning,[8] it is nevertheless instructive that Justice Scalia's view did not command a majority of the Court.  This Court declines Berman's invitation to interpret § 209(a) in a novel fashion, particularly since there is authority in this circuit and elsewhere that suggests that lump-sum payments are in fact covered by § 209(a).

As the government observes, "numerous other courts, including the D.C. Circuit, have simply assumed that § 209(a) applies to one-time payments."  Pl.'s Berman Opp'n at 14.  The case from this circuit cited by the government in support of that assertion is <u>United States v. Muntain</u>, which was heavily cited in <u>POGO I</u>.  <u>See</u> 454 F.3d at 309.  The relevant portion of that case for involved the payment of air fare -- a one-time payment -- for the spouse of a government employee.  610 F.2d at 969.  The D.C. Circuit wrote that "the jury could reasonably conclude that the cost of [the spouse's] air fare constituted a reward or bonus paid to [the employee]," and that it "would be possible to satisfy the first requirement of § 209" in that regard.  <u>Id.</u>  Although that

---

[8] Berman correctly points out that the majority opinion in <u>Crandon</u> does not necessarily preclude Justice Scalia's reading of § 209(a).  Def. Berman's Mot. at 8.  The majority did not reach, "because it had no need to reach," the question addressed by the concurring opinion.  <u>Id.</u>  Nevertheless, Berman's subsequent assertion that the "majority's policy analysis implicitly endorses Justice Scalia's analysis," <u>id.</u> at 22, goes too far.  In fact, he ignores a critical distinction between <u>Crandon</u> and the instant case: the <u>Crandon</u> majority was discussing a <u>pre-employment</u> payment scenario.  The majority's policy analysis in <u>Crandon</u> provides no support for Justice Scalia's interpretation as applied to receipt of lump-sum payments while employed by the government.

passage is arguably dictum,[9] it nevertheless indicates that the D.C. Circuit has assumed on at least one prior occasion that a lump-sum payment could violate § 209(a).[10]  Other federal courts have done so as well.  See, e.g., United States v. Oberhardt, 887 F.2d 790, 793 (7th Cir. 1989); United States v. Alfonzo-Reyes, 384 F. Supp. 2d 523, 534-35 (D.P.R. 2005).

Finally, Berman takes OLC to task for continuing to "offer opinions inconsistent with the plain language of § 209(a)" in the "post-*Crandon*" era.  Def. Berman's Mot. at 24.  In particular, citing two OLC decisions, Berman contends that "much of the reasoning and language employed by OLC" on occasions where it determined that no violation of § 209(a) had occurred should "compel[] the conclusion that [Berman also] did not violate § 209(a)."  Id. at 26.  To Berman, this is a "pristine example" of the inconsistencies that arise when § 209(a) is "erroneously" extended to cover lump-sum payments.  Id.  As described above, the Court is not persuaded that there is anything erroneous about the government's reading of the statute.  And although it is largely beside the point, the government has demonstrated that the two cases cited by Berman are factually distinct from this case.  Pl.'s Berman Opp'n at 26-32.

--------

[9] The court went on to hold that even if it assumed that the air fare satisfied the first requirement of § 209(a), the second requirement -- that is, payment for government services -- "presents an insurmountable obstacle to conviction in this case."  Muntain, 610 F.2d at 969-70.  Put another way, the D.C. Circuit found that the record indicated that "the payment to Muntain was for services having nothing to do with HUD business or with any responsibilities . . . to the Government as an employee of the United States."  Id. at 970.  Indeed, the court found that it was significant that "Muntain was on leave from his Government position" during the time that he received payment for the air fare.  Id.  In short, although Muntain may have been paid for the connections that he made during the course of his government service, the D.C. Circuit concluded that he was not ultimately being compensated for his "governmental services" or work product.  Id. (emphasis added).

[10] Arguably, this case itself is another example, as nowhere in POGO I is any doubt expressed as to the applicability of § 209(a) to the payment at issue here.

In short, Berman has failed to persuade this Court to adopt his interpretation of § 209(a), which neither <u>Crandon</u> nor any other federal court has adopted.  Because his only argument in favor of summary judgment hinges entirely on his reading of that statute, the Court will deny his motion.

<u>**CONCLUSION**</u>

It remains true, as the D.C. Circuit has noted, that the government's case is "strong" and that POGO and Berman face an "uphill battle" in defending against the government's "impressive" evidence.  <u>See</u> <u>POGO I</u>, 454 F.3d at 311, 313.  Still, however, the same genuine issues also remain, thus precluding summary judgment.

For the foregoing reasons, the United States' motion for summary judgment will be denied, as will Berman's motion for summary judgment.  A separate Order accompanies this Memorandum Opinion.


/s/      John D. Bates_____
         John D. Bates
United States District Judge


Dated:   December 3, 2007