## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.  03-0096 (JDB)** |
| **PROJECT ON GOV'T OVERSIGHT, et al.,** | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

A jury trial commenced in this case on February 6, 2008.  After both sides presented several days of evidence and their closing arguments, the case went to the jury on February 11, 2008.  On that same day, the jury returned a verdict finding that the government had proved by a preponderance of the evidence that both the Project on Government Oversight ("POGO") and Robert Berman had violated 18 U.S.C. § 209(a).  After the verdict was issued, POGO and Berman renewed their motions for judgment as a matter of law and also moved for a new trial. The Court established a briefing schedule for those motions and also ordered supplemental briefing concerning the appropriate penalty, if any, to impose in this case pursuant to 18 U.S.C. § 216(b).  Those fully briefed motions are presently before the Court.  Upon careful consideration, and for the reasons set forth below, the Court will deny defendants' motions and impose civil penalties as indicated.

## **BACKGROUND**

After two full rounds of summary judgment briefing, a trip to the D.C. Circuit and back, a

decision on a motion to dismiss, and a litany of motions *in limine*, this case finally proceeded to

trial on February 6, 2008.[1]  In its case-in-chief, the government attempted to demonstrate that

POGO paid -- and Berman received -- an award that contributed to or supplemented Berman's

salary as an employee of the Department of the Interior ("DOI") in violation of § 209(a).  The

government called four witnesses: (1) Danielle Brian; (2) H. Theodore Heintz, Jr.; (3) Robert

Berman; and (4) Patricia Davis.  Ms. Brian testified that Berman assisted her in understanding oil

royalty issues generally, and crafting appropriate Freedom of Information Act ("FOIA") requests

specifically.  She also testified that upon receipt of its first installment share of the *qui tam*

settlement proceeds, POGO issued a "public service award" to Berman in the amount of

$383,600 for his "decade-long public-spirited work" in connection with revealing the supposed

fraud perpetuated by the oil companies.  See Pl.'s Opp'n Dckt. #104 at 4 (quoting Gov. Ex. 2).[2]

Theodore Heintz, Berman's immediate supervisor, testified that Berman was the so-called

lead analyst on oil royalty issues at the Office of Policy Analysis at DOI for a period of "'roughly

10 years' from the mid-'80s to the mid-'90s." Id. at 5 (quoting Tr. Day 2 at 81:12-20).  Mr.

Heintz identified several memoranda written by Berman on that subject; he stated that he had

often reviewed them and passed them up the chain to his superiors within the Office.  In addition,

---

[1] The background information provided here is limited to the major developments at trial. For a full factual account of this matter, see United States v. Project on Gov't Oversight, 525 F. Supp. 2d 161 (D.D.C. 2007) ("POGO III").

[2] Given the large number of docket entries and various motions filed in this case, for ease of reference the Court will refer to any cited document by filing party and docket number.

Mr. Heintz had memorialized Berman's official responsibilities in various reports for purposes of evaluating Berman's job performance.  Many of those documents indicated that Berman had worked on oil royalty issues at various points throughout his tenure at DOI.  On cross-examination, counsel for both defendants vigorously questioned Mr. Heintz concerning his recollection of the time period during which Berman had analyzed oil royalty issues and on the extent of Heintz's knowledge regarding Berman's participation in those matters.  Mr. Heintz admitted to defense counsel that his statement during his deposition that Berman had worked on an inter-agency task force regarding oil royalties was inaccurate.  Although Berman was not involved with the task force, Mr. Heintz had mistakenly assumed that he was so involved due to Berman's expertise on the issues.  Mr. Heintz also admitted that although he was aware that at some point Berman was told not to work on oil royalty issues any further.  Mr. Heintz could not recall the precise date of that occurrence.

Next up was Berman.  On direct examination, he testified that "'POGO had [given him] the check because [he] had tried to bring the undervaluation issue to the attention of people within the Department of Interior.'"  Id. at 6 (quoting Tr. Day 3 at 160:22-25).  Berman also confirmed that he had authored several documents on the issue of oil royalty payments that were eventually cited in POGO's investigative report "Drilling for the Truth: More Information Surfaces on Unpaid Oil Royalties."  The government moved those documents into evidence.  See Gov. Exs. 7, 8.  Previously, Ms. Brian had testified that she relied upon those documents (which she obtained via her FOIA request) and Berman's assistance through various telephone calls to develop the investigative report.  See, e.g., Tr. Day 1 at 162:16-163:10, 165:7-174:13.  Berman confirmed that in 1996 he had edited the preamble of a Mineral Management Services rule-

making proposal concerning oil royalty payments (in conjunction with William Bettenberg) but he maintained that was the extent of his involvement in that process.

Finally, the government called Patricia Davis, an employee of the Department of Justice, to testify to the mechanics of *qui tam* suits and the specifics of DOJ's investigation into POGO's payment to Berman.  The government then rested.  POGO initiated its defense by calling Mark Guiton, a staffer at the time of Congressional hearings concerning oil royalty under-payments, to testify to the circumstances that brought Berman before Congress.  Finally, POGO called Lon Packard, outside counsel for POGO on various matters.  Mr. Packard testified that he disclosed to Ken Dodd, an attorney at DOJ, POGO's intention to make the payment to Berman prior to consummating the transaction.  According to Mr. Packard, DOJ did not instruct him to refrain from making the payment at that time.  POGO and Berman then rested, and the government offered no rebuttal case.

In closing argument, the government argued that it had adequately demonstrated the requisite link between POGO's payment of $363,800 and Berman's governmental work product.  That link, the government maintained, was established by POGO's own admission that it compensated Berman for his public-spirited work on oil royalty issues; in fact, the government produced evidence that Ms. Brian had stated that the purpose of the payment was to compensate the individuals who had been advocating for this position for years within the government.  Moreover, the inclusion of Berman's memoranda -- which the government argued constituted his official DOI work product pursuant to the testimony of Mr. Heintz -- reinforced the conclusion that POGO had paid Berman for his DOI services, according to the government.  Those memoranda, the government asserted, were written on government time while Berman was

drawing a salary from DOI.  Indeed, in closing the government noted that Berman "froze" when asked if drafting those memoranda were part of his job responsibilities.  See Tr. Day 5 at 27:8. As the government argued to the jury, Berman's position as an economist at the Office of Policy Analysis required that he do precisely what he did in this case: analyze DOI policy and make suggestions for improvement.  That DOI decision-makers did not ultimately adopt Berman's suggestions did not transform his work in that regard into unofficial whistle-blowing activity, the government insisted.

POGO and Berman, on the other hand, both argued to the jury that the government had utterly failed to demonstrate the required causal link.  Berman assailed Mr. Heintz's credibility in light of his mistaken deposition testimony concerning the task force, as well as his inability to recall several dates with precision.  He also made much of the fact that the government never instructed POGO not to make the payment to Berman after Dodd was notified of POGO's intention to do so.  Berman's work on oil royalties fell outside of the official scope of his duties, he argued, because he had been expressly instructed to cease working on the issue by his superiors at DOI.  He also attempted to draw a distinction between work containing detailed economic analysis, which is "official" work as he would have it, and the periodic updates that he sent to his supervisors at DOI concerning oil royalties litigation, which he characterized as outside of his official job responsibilities.

For its part, POGO also focused on the fact that Berman was excluded from working on oil royalty issues at some point in 1993 or 1994.  POGO emphasized that Berman appeared before Congress to testify on that matter as a whistle-blower; DOI, POGO asserted, had no intention of sending Berman to testify before Congress in an official capacity.  According to

POGO, most of Berman's work on oil royalties was performed before POGO even became involved in the issue.  That, in turn, indicates that POGO did not compensate Berman for the memoranda that he authored, the argument goes.  POGO also suggested that its payment could not have been in compensation for Berman's job responsibilities because POGO itself was unaware of what Berman's official duties entailed.

On rebuttal, the government stressed that POGO's investigative report contained citations to many of Berman's memoranda and other documents prepared on the job.  And those documents were obtained through a FOIA request, which indicates that they were official government documents: after all, the government argued, the only documents released through FOIA are government documents.  The government also reiterated that Ms. Brian affirmed that the payment was for "Mr. Berman's years of bringing this issue on the undervaluation of oil royalties to the attention of his superiors."  See Tr. Day 5 at 81:13-15.  In short, the government asserted that when Berman was reporting on the undervaluation of oil royalties -- the activity that defendants refer to as whistle-blowing -- he was simply doing the job that he was paid to do by the federal government.  On that note, the case went to the jury, which promptly returned a verdict in favor of the government.

**STANDARD OF REVIEW**

The Federal Rules of Civil Procedure provide that a Court may "grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal law."  See Fed. R. Civ. P. 59(a).  The decision to grant a new trial falls within the sound discretion of the trial court.  See Hutchinson v. Stuckey, 952 F.2d 1418, 1420 (D.C. Cir. 1992).  "[M]indful of the jury's special function in our legal system and

hesita[nt] to disturb its findings," Nyman v. FDIC, 967 F. Supp. 1562, 1569 (D.D.C. 1997), a court should only grant a new trial "'where the court is convinced the jury verdict was a seriously erroneous result' and where denial of the motion will result in a 'clear miscarriage of justice.'" Martinez v. District of Columbia, 503 F. Supp. 2d 353, 355 (D.D.C. 2007) (quoting Nyman, 967 F. Supp. at 1569) (internal quotations omitted).  "Generally, a new trial may only be granted when a manifest error of law or fact is presented."  In re Lorazepam & Clorazepate Antitrust Litig., 467 F. Supp. 2d 74, 87 (D.D.C. 2006).

Pursuant to Fed. R. Civ. P. 50(a), a court may grant judgment as a matter of law during or after "a jury trial . . . [if] the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  See Fed. R. Civ. P. 50(a)(1).  In entertaining a "motion for judgment as a matter of law, the court should review all of the evidence in the record."  Reeves v. Sanderson Plumbing Prods., Inc., 540 U.S. 133, 150 (2000).  "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  Id.  "Entry of judgment as a matter of law under Rule 50 is warranted only if 'the evidence and all reasonable inference that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in plaintiff's favor.'"  Alkire v. Marriott Int'l., Inc., 2007 WL 1041660 at *1 (D.D.C. Apr. 5, 2007) (quoting McGill v. Munoz, 203 F.3d 843, 845 (D.C. Cir. 2000)).

## DISCUSSION

### I.    Defendants' Motions for a New Trial

In support of its motion for a new trial, POGO argues that "[o]f course, in this case . . . a manifest error of law occurred."  POGO's Mot. Dckt. #100 at 2.  POGO takes the Court to task

for rejecting its position that § 209(a) has a specific *mens rea* element, and thereby improperly

converting § 209(a) into a strict liability offense.  Moreover, POGO generally maintains that

evidence of its intent in making the payment to Berman should have been admissible throughout

the proceedings.  Berman joins those complaints and also adds that the Court erred in two

additional ways.  First, Berman insists, the Court erroneously failed to instruct the jury that a

lump-sum payment does not constitute a contribution to or supplementation of "salary" for

purposes of § 209(a).  Second, the Court neglected to instruct the jury concerning what activities

constitute Berman's official government work product.  As Berman would have it, the Court

should have instructed the jury that only "assigned tasks as an economist," see Berman's Mot.

Dckt. #101 at 2, amount to his official duties.  In addition, the Court should have instructed the

jury that other endeavors undertaken by Berman, such as the so-called whistle-blowing with

respect to oil royalty under-payments, do not fall within the scope of his government

employment.  None of these arguments is persuasive.

Berman's first separate contention, that lump-sum payments are not prohibited by §

209(a), has already been rejected by this Court.[3]  See POGO III, 525 F. Supp. 2d at 171-74.  At

the time the Court first considered this question, Berman offered neither authority nor persuasive

reasoning to support his contention, and that remains true.  Suffice it to say, as this Court has

already noted, concluding that § 209(a) does not apply to lump-sum payments would be ruinous

to the statute's established prophylactic purpose.  Id. at 172.  No Court has so held.  To the

---

[3] Indeed, Berman's proposal would have made for an odd jury instruction.  In effect, it
would have informed the jury that nothing even potentially unlawful took place with respect to
the payment, which likely would have led the jurors to question -- correctly so -- why they had
just endured a week-long trial.

contrary, there is ample authority supporting the opposite conclusion.  Id. at 173 (collecting cases).

Berman's second contention is equally without merit.  All throughout the summary judgment proceedings, both defendants have maintained that the question of the nature and scope of Berman's official government duties was an issue of fact for the jury to decide.  In spite of that long-standing position, however, Berman now insists that it was error to leave that very question to the jury.  However, it is for the jury to decide what Berman's official responsibilities were, what he did, and hence whether his conduct constituted government services.  Had the Court instructed the jury as Berman proposes -- that only "assigned tasks as an economist" constitute his government work -- it would have basically decided an important aspect of the case as a matter of law, which would have called the utility of the trial into question.  But even taken on its own terms, Berman's argument fails.  As explained above, the record contains evidence of detailed economic analysis performed by Berman while at DOI that would have permitted the jury to conclude that his oil royalty work was a component of his official government responsibilities in any event.

Turning to the *mens rea* question, the Court notes at the start that it has already discussed this issue at length over the course of several earlier opinions.  Nothing has changed to persuade the Court to alter its prior conclusion, but to assist with clarity, the major reasons underlying that decision will be repeated here.  In relevant part, 18 U.S.C. § 209(a) provides:

> Whoever receives any salary, or any contribution to or supplementation of salary, as compensation for his services as an officer or employee of the executive branch of the United States Government, . . . from any source other than the Government of the United States . . .; or
> Whoever . . . pays, makes any contribution to, or in any way supplements, the salary

of any such officer or employee under circumstances which would make its receipt
a violation of this subsection --
Shall be subject to penalties set forth in section 216 of this title.

On its face, the statutory text contains no *mens rea* or intent elements.  Nevertheless, POGO and

Berman insist that the statute must effectively be read to include only <u>knowing</u> receipt of

payment as compensation for government services and only <u>intentional</u> payment as compensation

for government services.  As explained below, there is no basis for that contention.

There are four basic elements to a § 209(a) violation: (1) a non-government party (2)

makes a contribution or supplementation to (3) the salary of an executive branch official (4) "as

compensation for his services as an officer or employee of the executive branch."  The subjective

intent controversy centers around the final element, and indeed that was also the only seriously

disputed issue at trial.  The Court has previously broken down that element further into two

distinct inquiries.[4]  The first is what the disputed payment was <u>for</u> -- i.e., what activity prompted

the compensation.  The Court has suggested[5] that the parties' subjective intent may be relevant to

determining what the payment was for, particularly where there are various disparate activities --

some governmental and some not -- that may have motivated the payment.  <u>See</u> <u>United States v.</u>

<u>Project on Gov't Oversight</u>, 531 F. Supp. 2d 59, 60-61 (D.D.C. 2008) ("<u>POGO V</u>").  Here,

however, it is largely undisputed that POGO paid Berman <u>for</u> his body of work concerning oil

royalties; indeed, POGO has admitted as much.  <u>See</u> <u>United States v. Project on Gov't Oversight</u>,

454 F.3d 306, 312 (D.C. Cir. 2006) ("<u>POGO I</u>").  The only disputed matter is whether that body

_____

[4] The D.C. Circuit endorsed a similar approach in <u>United States v. Muntain</u>, 610 F.2d
964, 969 (D.C. Cir. 1979).

[5] Because there has never been a need to decide this exact question, it would be
inaccurate to characterize the previous discussion of this issue as a "holding."

of work qualified as part of Berman's "services as an officer or employee of the executive

branch," which the Court has identified as the second inquiry under this fourth element, and to

which it now turns.

Neither POGO's nor Berman's subjective belief or understanding concerning whether

Berman's oil royalties work constituted "services as an officer or employee of the executive

branch" is relevant to the proper characterization of that work.  In Crandon v. United States, 494

U.S. 152 (1990), the Supreme Court settled this point by stating that: "Neither good faith, nor full

disclosure, nor exemplary performance of public office will excuse the making or receipt of a

prohibited payment."  Id. at 165.  As previously indicated, both good faith and full disclosure are

evidence of "intent" in some respects.  See, e.g., Black's Law Dictionary 713 (8th ed. 2004)

(defining "good faith" as "[a] state of mind consisting in . . . honesty in belief or purpose . . . [or]

faithfulness to one's duty or obligation.").  It is therefore difficult to read that Crandon passage as

anything other than a blanket statement that a party's belief in the innocence of its conduct has no

relevance to § 209(a) liability.

The only directly applicable authority that defendants can muster that points to a different

conclusion -- the lower court opinions in Crandon -- hardly amounts to "authority" at all.  It is

true that the lower courts did consider *mens rea* or subjective intent in the manner that defendants

would have it here, but those opinions no longer reflect good law in light of the ultimate

disposition in Crandon.  The passage cited above is thus inescapable.  And the suggestion that the

Supreme Court "condoned" the *mens rea* discussions found in the lower court opinions in

Crandon is simply incorrect.  Because the Supreme Court decided the threshold question of

whether § 209(a) applied to payments made to individuals before they enter government service

in the negative, it had no occasion to address the other issues discussed below.  In effect, the portions of the lower court proceedings not explicitly reversed were instead vacated.  Hence, they cannot provide any aid to defendants here.

The conclusion that § 209(a) does not take account of subjective intent is reinforced by the purpose of the statute as elucidated by the Supreme Court in Crandon.  There, the Court explained that § 209(a) is a "prophylactic rule[] . . . intended to prevent even the appearance of wrongdoing . . . that may apply to conduct that has caused no actual injury to the United States." Crandon, 494 U.S. at 164 (emphasis added).  The prophylactic force of § 209(a) would be severely diminished if defendants' construction were to be adopted.  A party's subjective belief has no bearing on the "appearance of wrongdoing"; "appearance" is uniquely focused on how third-parties view a transaction.  The broad sweep of § 209(a)'s prophylactic effect is designed to deter a wide range of payments because determining whether any particular payment is unlawful on a case-by-case basis is a particularly difficult endeavor that would often, as here, involve self-serving testimony from the parties.  As this Court previously observed: "What an organization deems a 'public service award,' as POGO puts it, could easily be seen as a payment to curry favor with that employee by an outside observer."  United States v. Project on Gov't Oversight, Dckt. # 95 at *5 (D.D.C. Feb. 4, 2008) ("POGO VI").  Hence, to avoid that difficulty, Congress drafted § 209(a) to prohibit all private payments in compensation for an employee's government services -- even payments that simply appear to be for an employee's government work.

There is additional evidence to suggest that the omission of any *mens rea* terms from § 209(a) is not the result of mere oversight.  To the contrary, when compared with the other federal conflicts statutes, the choice to omit terms of subjective intent appears to be deliberate.  When

Congress sought to require *mens rea* elements in other federal conflicts statutes, it did so clearly and unequivocally.  See, e.g., 18 U.S.C. § 201(b) ("corruptly"); §§ 203(a)(2) & (b)(2) ("knowingly"); §§ 207(a)(1), (a)(2), (d)(1) & (e)(1)-(5) ("knowingly makes, with the intent to influence"); § 215(a) ("corruptly"); § 216(a)(2) ("willfully" required for felony punishment); § 224(a) ("with knowledge that the purpose of such scheme is to influence . . ."); §§ 226(a)(1) & (2) ("corruptly").  It bears repeating that § 209(a) contains no such express *mens rea* requirements.  To read those terms into § 209(a), as defendants suggest, would thwart Congress' careful drafting.

The Supreme Court's decision in Staples v. United States, 511 U.S. 600 (1994) -- the import of which was the subject of POGO VI -- does not counsel a different result.  In Staples, the Court noted that "offenses that require no *mens rea* are generally disfavored," id. at 606, and held that to obtain a criminal conviction under the firearms statute at issue the government must prove that the defendant knew of the features of his weapon that brought it within the reach of the statute, id. at 619.  Defendants read Staples to cabin the scope of *mens rea*-free offenses to the narrow category of "public welfare" offenses -- that is, offenses that cover activities that are inherently dangerous or harmful -- that were discussed in that opinion.  But Staples is not so limited.

To begin with, there is no suggestion in Staples that only public welfare offenses can dispense with the *mens rea* requirement; instead, the Supreme Court merely pointed out that public welfare offenses are the traditional examples of such statutes.[6]  Moreover, many of the

---

[6] Along those same lines, the Supreme Court noted that strict liability offenses are "disfavored," not that they are "forbidden."

concerns that alarmed the Court in Staples are not present here.  Significantly, the Supreme Court explained that "there is a long tradition of widespread gun ownership by private individuals in this country," and "guns generally can be owned in perfect innocence."  Id. at 611.  Thus, to read the firearms statute at issue as broadly as the government urged would potentially have exposed a large portion of the populace to criminal punishment even if any particular person did not know that the firearm she owned amounted to a "machine gun" that was regulated by the statute.

But there is no such risk here for two reasons.  First, unlike gun ownership, there is no long tradition of private citizens making widespread payments to executive branch employees for services that are arguably within their government employment.  Hence, there is no risk of potentially criminalizing a broad range of otherwise innocent behavior as in Staples.  More importantly, the harsh penalty -- up to 10 years imprisonment -- in Staples raised the stakes for criminalizing the conduct at issue.  There is no similar danger here; after all, this is a civil penalty case.  And although § 209(a) is a hybrid statute, the enforcement provisions found in § 216 serve critical limiting functions.  Pursuant to § 216(a)(1), misdemeanor violations have no *mens rea* requirement, nor do the civil penalty provisions contained in § 216(b).  On the other hand, pursuant to § 216(a)(2), any felony penalty under § 209(a) requires proof of a willful violation.  See 18 U.S.C. § 216(a)(2) ("[w]hoever willfully engaged in the conduct constituting [a violation of § 209] shall be imprisoned for not more than five years . . .").  Thus, unlike the statute at issue in Staples, here no felony penalty may be imposed without proof of the requisite *mens rea* element.  The careful distinctions drawn between §§ 216(a)(1) and (a)(2) serve to reinforce the conclusion that the omission of *mens rea* terms in § 209(a) was deliberate; Congress instead sought to deal with the issue of intent via the enforcement or penalty arm of the statute.

Finally, even if § 209(a) -- read in conjunction with § 216 -- is indeed a strict liability offense, it would not be the only federal conflicts statute in that status.  Other courts have found that different provisions of the conflicts statutes do not embody a *scienter* element.  See, e.g. United States v. Baird, 29 F.3d 647, 652 (D.C. Cir. 1994) (§ 203); United States v. Hedges, 912 F.2d 1397, 1400 (11th Cir. 1990) (§ 208(a)).  In fact, in United States v. Sun-Diamond Growers, 526 U.S. 398 (1999), the Supreme Court broadly interpreted § 209(a) to "criminalize[] the giving or receiving of any 'supplementation' of an Executive official's salary . . . without regard to the purpose of the payment."  Id. at 409 (emphasis added).

Simply put, defendants' preferred construction of § 209(a) cannot be sustained.  Their concern that the Court's reading may criminalize supposedly innocuous gift-giving to government employees, such as Macarthur Foundation stipends, is misplaced.  Although such gifts may technically fall within the wide sweep of § 209(a),[7] the government maintains prosecutorial discretion and it may elect not to take action if it determines that any given payment is for demonstrated genius, etc., and not for particular government services.

None of the so-called errors identified by defendants warrants a new trial.  Accordingly, the Court will deny the motion for a new trial filed by each defendant.[8]

---

[7] Not to mention the fact that this prohibition may be precisely what Congress intended.

[8] Out of an abundance of caution and to avoid any potential prejudice to the defense, in closing argument the Court permitted counsel for POGO to argue that POGO could not have compensated Berman for his government services without knowing what those services were -- even though that argument struck the Court as uncomfortably close to an argument based on subjective intent.

## II.      Defendants' Motions for Judgment as a Matter of Law

Both POGO and Berman[9] argue that they are entitled to judgment as a matter of law

because the government failed to prove the required causal link for § 209(a) liability: that POGO

paid Berman as compensation for his services as a government employee.  Indeed, POGO insists

that there "is not a shred of evidence to support" the government's theory of the case.  See POGO

Mot. Dckt. #100 at 5.  The Court disagrees.

POGO begins by arguing vigorously that the fact that Berman assisted Ms. Brian in

drafting FOIA requests and by explaining "complex issues regarding the valuation of oil

royalties" does not establish the requisite link.  Id. at 3-4.  That contention, POGO maintains, is

substantiated by Mr. Heintz's testimony that Berman's official duties do not include "assisting

third parties to draft FOIA requests or . . . explain[ing] the oil business to outsiders."  Id. at 3.

Although that is true, the Court is not quite sure what to make of this point.  As the Court

understands it, the government has never argued that the link between the payment and Berman's

government services is established solely by the aid and assistance that he rendered to Ms. Brian.

Indeed, the government did not even directly respond to this contention in its opposition brief.

Next, POGO argues that the chronology of events "also supports POGO's contention that

there was no link between the award and Mr. Berman's official job responsibilities."  Id. at 4.  As

POGO would have it, the organization did not become involved in oil royalty issues until 1994.

And by "early 1995," its "substantive involvement" with Berman ceased until it shared the qui

tam proceeds with him in 1998.  Thus, POGO blithely concludes, if it had intended to

---

[9] Because Berman merely incorporates by reference POGO's arguments on this point, the Court will hereinafter refer only to POGO in this section of the Memorandum Opinion.  The analysis applies equally to both defendants, however.

compensate Berman for "his official governmental duties, it would have done so in 1994 or 1995, not over three years later." Id. at 5.  This argument is specious at best.  To begin with, as the government correctly notes, there is no suggestion in either the statute or the relevant case law that the payment needs to be contemporaneous with the employee's services.  And there is no logical reason why POGO could not have compensated Berman in 1998 for services he performed in 1994 (or 1986, for that matter), particularly given that the agreement to pay Berman the award was always contingent upon the successful outcome of the *qui tam* suits, which did not begin to pay out until 1998.

At bottom, POGO finally reaches the conclusion that the government "must be asserting that POGO compensated Mr. Berman for his past official job responsibilities, *i.e.*, for his writing the memoranda in 1993-1995, and explaining buy-sells and assisting POGO with its FOIA requests in 1994 to early 1995.  Yet, there is not a shred of evidence to support this theory." Id. at 5.  Unfortunately for POGO, the government made a powerful showing to the contrary.  The government notes that Ms. Brian herself admitted that POGO issued the awards to ensure "that the individuals that have been doing this work for years would be compensated."  Pl.'s Opp'n Dckt. #104 (quoting Gov. Ex. 3).  On its face, that statement plainly indicates that POGO was compensating Berman for his collective work on the issue of oil royalties -- dating back not just to 1993, as POGO suggested, but in fact all the way to 1986.

And the trouble for POGO is that the government asserts that the work Berman admittedly performed on royalty under-payments constituted his official government work product.  To support that proposition, the government relies upon the testimony of Mr. Heintz, who indicated that Berman was the lead analyst on oil royalty issues for approximately ten years.

Moreover, Mr. Heintz also stated that it was Berman's duty, generally speaking, to analyze DOI policy and make suggestions for improvement.  That, the government argues, is precisely what Berman was doing when he prepared the various memoranda advocating for the use of NYMEX market prices for oil royalty valuations.  Indeed, Berman presented those documents to Mr. Heintz, who in turn reviewed them and circulated them within OPA and MMS.

That is a powerful showing that the royalty work fell within Berman's official government duties.  In response, defendants attacked Mr. Heintz's credibility because he had difficulty recalling specific dates while on the witness stand, particularly the precise date that Berman had been excluded from further work on oil royalty matters.  At best,[10] however, defendants have accomplished just that: they have merely undermined a witness's credibility.  But credibility determinations are for the jury; they cannot supply the basis for judgment as a matter of law.  See In re Lorazepam, 467 F. Supp. 2d at 80 ("When making its decision [on a Rule 50 motion] . . . the court must draw all reasonable inferences in favor of the non-moving parties, and it may not make credibility determinations or weigh the evidence.") (citing Reeves, 530 U.S. at 150); see also POGO I, 454 F.3d at 313 ("Evaluation of the credibility of witnesses must be left to the factfinder . . .  and 'the need to assess the credibility of witnesses is precisely what places this dispute outside the proper realm of summary judgment.'") (quoting Washington Post Co. v. U.S. Dep't of Health & Human Servs., 865 F.2d 320, 326 n. 8 (D.C. Cir. 1989).

The government adds that Berman's numerous government memoranda that were cited in

---

[10] The government stresses that although Mr. Heintz's precise personal recollection of events may have been called into question by defendants' cross-examination, his meticulous written reports of Berman's activities during the period in question -- reports that indicated Berman was working on oil royalty matters as late as 1996 -- were not discredited by defendants' efforts.  See Pl.'s Opp'n Dckt. #104 at 5.

POGO's "Drilling for the Truth" report provide further support for the link between the payment and Berman's governmental work.  That report indicates that POGO was aware of the scope of Berman's efforts within DOI; indeed, POGO cited to those efforts with approval in "Drilling for the Truth."  A juror could reasonably infer, particularly in light of Ms. Brian's statement noted above, that POGO was rewarding Berman at least in part for his superior analysis reflected in his official memoranda.  Defendants have no ready response to this argument, other than to maintain that the memoranda do not constitute Berman's official work.[11]  But based on the testimony the government elicited from Mr. Heintz and Berman himself, the question of whether those documents constitute Berman's government work product is one for the jury.  And there was ample evidence to support the conclusion that those memoranda reflect Berman's governmental services in his position at DOI, particularly when viewed in the light most favorable to the government as is required on these motions.

In sum, defendants have not come close to satisfying their burden to show that a reasonable jury did not have a legally sufficient evidentiary basis to rule for the government, in

---

[11] Oddly enough, POGO argues that the citations to Berman's reports in "Drilling for the Truth" demonstrate that "POGO did not violate § 209" because "[w]riting memoranda for an outside party was not part of Mr. Berman's official job responsibilities."  POGO's Mot. Dckt. #100 at 6 n. 5.  That is seriously mistaken.  The government has never argued that Berman prepared the memoranda for POGO.  To the contrary, the government has steadfastly maintained that Berman wrote the memoranda for DOI as part of his job responsibilities.  Similarly, POGO's argument that "the government lacks any evidence whatsoever to contradict POGO's claim . . . that POGO did not pay Mr. Berman to prepare his whistleblowing memoranda so the organization could utilize them in the *qui tam* litigation," id. at 4 n. 3, is entirely beside the point.  As the government correctly points out, § 209(a) is not a bribery statute.  The government is not required to demonstrate POGO's payment prompted Berman to take some sort of action on POGO's behalf.  In fact, § 209(a) contemplates the exact opposition causal connection -- that is, as here, that a private party makes a payment to reward some prior action taken by a government employee.

order to displace the jury's verdict.  Hence, the Court will deny both defendants' motions for

judgment as a matter of law.

### III.    Civil Penalties

That brings us to the question of what civil penalties, if any, to impose in this case.

POGO urges the Court to impose no penalty at all upon it.  The government, on the other hand,

maintains first that the statute calls for a mandatory imposition of a penalty in the full payment

amount of $383,600, on each defendant.  Alternatively, even if the final penalty amount rests

within the Court's discretion, there is no reason to depart downwards from $383,600 in this case,

according to the government.  Somewhat surprisingly, Berman is silent on this question.

The civil enforcement provision of § 209(a) is found in 18 U.S.C. § 216(b).  That section

provides, in relevant part:

> [A]ny person who engages in conduct constituting an offense under section . . . 209
> . . . upon proof of such conduct by a preponderance of the evidence . . . shall be
> subject to a civil penalty of not more than $50,000 for each violation or the amount
> of compensation which the person received or offered for the prohibited conduct,
> whichever amount is greater.

See 18 U.S.C. § 216(b).  The government argues that the "not more than" phrase modifies only

the $50,000 amount.  Under that construction, § 216(b) would provide for two available

penalties: (1) a statutory penalty of not more than $50,000 or (2) the amount of the prohibited

payment, whichever is the greater.  POGO responds that the "not more than" phrase modifies

both the $50,000 amount and the payment amount such that a court retains discretion to impose a

penalty of less than the full amount of the prohibited payment.

Both offered constructions of the statute are plausible and can fairly comport with

common usage.  The government's argument that POGO's reading of § 216 would render the

"whichever amount is greater" clause superfluous is incorrect.  The effect of that clause is to set a variable ceiling on the amount of the penalty.  In cases where the prohibited payment totals less than $50,000, Congress instructed that $50,000 is the maximum penalty that a court may impose.  In cases where the payment is greater than $50,000, however, Congress provided that the maximum penalty that a court may impose is the full amount of that payment.  Construing § 216 such that "not more than" also modifies the amount of the prohibited payment does not alter that reading of the "whichever greater" clause in any significant fashion.  Thus, the government's objection that POGO's construction would reduce the "whichever amount is greater" clause to mere surplusage is unfounded.  So, too, is POGO's conclusory contention that it is "beyond any doubt that this Court possess the discretion to impose the penalty it desires, subject to the maximum ceiling contained in § 216(b)."  POGO's Reply Dckt. #108 at 2 n. 1.  As noted above, § 216(b) is ambiguous on that point.

But one other powerful factor favors POGO's interpretation.  The Supreme Court has long held that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."  United States v. Bass, 404 U.S. 336, 347 (1971) (internal citation omitted).  To be sure, § 216(b) itself is not strictly speaking a criminal statute (although it does appears in the federal criminal code).  That is, § 216(b) is the civil enforcement provision for several underlying federal crimes, including § 209(a).  But the Court believes that the principles underlying lenity should nevertheless apply in this context.  As POGO persuasively points out, § 216(b)'s penalty provision is closely analogous to sentencing in a criminal proceeding.  And in criminal sentencing, of course, a court retains broad discretion to entertain a wide range of mitigating factors that it deems relevant.  Moreover, the government's suggestion that the sentencing

analogy is inapt because a "person's liberty is not at stake here," Pl.'s Opp'n Dckt. #107 at 6, is

unavailing.  While the government's observation is correct, the purpose of a civil penalty -- like a

criminal sentence -- is punishment rather than compensation.  Punishment, then, is the pertinent

similarity between a civil penalty and a criminal sentence that separates them both from civil

damages.  Section 216(b)'s close relationship with the underlying criminal conduct, as well as

the penalty's patent similarity to criminal punishment in general, persuades the Court to construe

the ambiguity in § 216(b) in favor of POGO in this case.  Thus, the Court has the discretion to

impose less than the full amount of POGO's payment to Berman as a civil penalty against either

defendant.

   The question of how to exercise that discretion in this case, however, is another matter.

As noted above, Berman has not offered any views on the scope of the penalty provision

contained in § 216(b).  And the Court sees no independent reason to depart downwards from

imposing a penalty in the full amount of the payment of $383,600 against Berman.  After all, that

is what he received, and a penalty of any lesser amount would mean that he still benefitted from

the violation of § 209(a) found by the jury.  As for POGO, the Court will impose a lesser penalty

of $120,000.  The Court is persuaded that the record contains adequate evidence that POGO

made this payment openly and in good faith -- namely, the prior disclosure to DOJ, POGO's

desire to hold a press release concerning the payment, and the appropriate tax filings made by

POGO.  Although Crandon holds that good faith is no defense to liability under § 209(a), it does

not suggest that a Court cannot take good faith into account when considering the appropriate

penalty to impose.[12]  The penalty of $120,000 reflects POGO's good faith while also recognizing that the payment was ultimately unlawful.  It is also a sufficient penalty to deter similar future conduct by POGO or others.

### IV.    Remaining Claims

Finally, there are three remaining counts from the Complaint still pending: (1) Count III, a claim for breach of fiduciary duty against Berman; (2) Count IV, a claim of unjust enrichment against Berman; and (3) Count V, a request for declaratory and injunctive relief against both defendants.  In the post-trial proceedings, counsel for POGO indicated that there would be no further payments made to Berman.  In light of that admission, the Court questions the continuing necessity of pursuing Count V, but that decision is of course up to the government.

The Court also has certain misgivings concerning the viability of Counts III and IV. Specifically, the Court questions whether the government has suffered actionable damages in this case.  On Count III, even assuming that Berman has breached a fiduciary duty owed to the government, what resulting harm has the government suffered for which Berman would be liable?  Similarly, on Count IV, even if Berman was unjustly enriched, it does not appear that it was at the expense of the government; again, for what harm does the government aim to recover? The Court will not resolve these questions today.  During the post-trial proceedings, the Court suggested that the remaining claims would be resolved separately from the post-trial motions and penalty question.  The parties should, however, take the Court's observations here into account going forward.

---

[12] Indeed, this determination helps to relieve any lingering pressure resulting from disregarding defendants' good faith during the liability phase.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court will deny defendants' motions for a new trial or, alternatively, for judgment as a matter of law.  The Court will impose penalties of $363,800 against defendant Robert Berman and $120,000 against POGO, respectively.  A separate Order accompanies this Memorandum Opinion.

/s/    John D. Bates

John D. Bates

United States District Judge

Dated:   April 10, 2008