## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>    **Plaintiff,**<br><br>        **v.**<br><br>**PROJECT ON GOVERNMENT OVERSIGHT, et al.,**<br><br>    **Defendants.** | **Civil Action No.  03-0096 (JDB)** |

## <u>MEMORANDUM OPINION</u>

This matter is before the Court on remand from the D.C. Circuit.  On February 11, 2008, a jury found that defendants Robert Berman and the Project on Government Oversight ("POGO") had violated 18 U.S.C. § 209, which prohibits making "any contribution to or supplementation of salary" to a federal employee "as compensation for his services as an officer or employee of the executive branch of the United States Government," and prevents federal employees from accepting any such payments.  This Court assessed a civil penalty of $383,600 against Berman and $120,000 against POGO, and both defendants appealed.  The D.C. Circuit found that the jury had been improperly instructed on the issue of intent and that the error was not harmless.  It therefore vacated the jury's verdict and remanded the case to this Court.  On remand, the United States has sought summary judgment against only defendant Berman, and has indicated that it plans to proceed against POGO at a later trial.  <u>See</u> Notice of Intentions Regarding Summary Judgment [Docket Entry 138]; <u>see also</u> Tr. of Status Hearing (Nov. 19,

2011) at 6.  Berman has cross-moved for summary judgment and moved to dismiss the case

based on the government's allegedly improper conduct.  For the reasons given below, the Court

will deny both of Berman's motions and grant in part the government's motion for summary

judgment.

<u>BACKGROUND</u>

The background of this case has been recited in numerous opinions, so only the most

important facts will be summarized here.  <u>See</u> <u>United States v. POGO</u>, No. 03-96, Order [Docket

Entry 31] ("POGO I"); <u>United States v. POGO</u>, 454 F.3d 306 (D.C. Cir. 2006) ("POGO II");

<u>United States v. POGO</u>, 484 F. Supp. 2d 56 (D.D.C. 2007) ("POGO III"); <u>United States v.</u>

<u>POGO</u>, 525 F. Supp. 2d 161 (D.D.C. 2007) ("POGO IV"); <u>United States v. POGO</u>,  531 F. Supp.

2d 59 (D.D.C. 2008) ("POGO V"); <u>United States v. POGO</u>, 543 F. Supp. 2d 55 (D.D.C. 2008)

("POGO VI"); <u>United States v. POGO</u>, 572 F. Supp. 2d 73, 75-77 (D.D.C. 2008) ("POGO VII");

<u>United States v. POGO</u>, 616 F.3d 544 (D.C. Cir. 2010) ("POGO VIII").

The case arose in the 1980s when Robert Berman, then a senior economist in the Office

of Policy Analysis within the Department of the Interior ("DOI"), became interested in the

proper valuation of oil royalties.  His concern was that oil companies were underestimating the

royalties they are required to pay when they extract oil from federal or Native American lands.

<u>POGO IV,</u> 525 F. Supp. 2d. at 162.  In the early 1990s, POGO, an organization dedicated to

investigating and exposing "subservience of the federal Government to special interests," also

began investigating underpayment of oil royalties.  <u>POGO II</u>, 454 F.3d at 306 (internal quotation

marks omitted); <u>POGO IV</u>, 525 F. Supp. 2d at 162.  In June 1994, an anonymous source leaked

one of Berman's memoranda on oil royalty issues to Danielle Brian, POGO's Executive Director,

who found it helpful.  POGO IV, 525 F. Supp. 2d at 163.  Brian contacted Berman, and over the next two years they had "twenty or thirty telephone conversations" in which Berman "explained . . . the mechanics of the transactions employed by the oil industry" to Brian.  Id.; see also POGO II, 454 F.3d at 307.  Berman also advised Brian on how to file FOIA requests on the topic. POGO VIII, 616 F.3d at 546.

Based in part on the information acquired through Berman's aid, POGO filed two qui tam actions to recover unpaid royalties in the United States District Court for the Eastern District of Texas.  Id.  Berman declined POGO's invitation to serve as a co-relator in the lawsuits, but he did enter into a written agreement specifying that he would receive one third of any monetary award POGO received as a result of the qui tam litigation.  Id.  The United States ultimately intervened in the qui tam proceedings and collected a $440 million recovery.  POGO IV, 525 F. Supp. 2d at 164.  In October 1998, POGO "received its 1.2 million share of the first settlement in the qui tam actions," and in November 1998, POGO issued a check for $383,600 to Berman.  Id.; see also POGO II, 454 F.3d at 307.  The check stated that the payment was a "Public Service Award," and the accompanying letter described the check as an award for Berman's "decade-long public-spirited work to expose and stop the oil companies' underpayment of royalties for the production of crude oil on federal and Indian lands."  POGO II, 454 F.3d at 307; see also POGO IV, 525 F. Supp. 2d at 164.

This transaction drew the attention of attorneys at the Department of Justice.  They launched a criminal investigation, but ultimately charged Berman and POGO with only civil violations of 18 U.S.C. § 209 and various common-law claims.  18 U.S.C. § 209 forbids one from "receiv[ing] any salary, or any contribution to or supplementation of salary, as

compensation for his services as an officer or employee of the executive branch of the United

States Government . . . from any source other than the Government of the United States" or from

"mak[ing] any contribution to, or in any way supplement[ing], the salary of any such officer or

employee under circumstances which would make its receipt a violation of this subsection." 18

U.S.C. § 209; POGO IV, 525 F. Supp. 2d at 164.  In 2004, a previous district judge granted the

government's motion for summary judgment on Count I, the § 209 count, without explanation.

See POGO I [Docket Entry 31] at 1.  POGO appealed, and the D.C. Circuit reversed.  POGO II,

454 F.3d at 306.  The D.C. Circuit called the government's evidence "impressive," id. at 311, but

after reviewing the record in detail, it found several pieces of conflicting evidence that favored

the defendants.  Id. at 311-13.  The court of appeals observed that, in light of the conflicting

evidence, the outcome of the litigation would likely hinge on defendants' credibility.  Id. at 313.

Because credibility determinations are generally the province of a factfinder, the D.C. Circuit

reversed the grant of summary judgment and remanded to this Court for further proceedings.  Id.

        After remand, the government moved for summary judgment on Count I a second time,

"citing 'new' evidence that allegedly eliminate[d] the credibility issues that the D.C. Circuit

identified."  POGO IV, 525 F. Supp. 2d 166.  This Court found, however, that the so-called

"new" evidence was either not new or failed to "decisively refute[]" the conflicting evidence that

the court of appeals had found significant.  Id. at 170.  This Court concluded that the

government's motion was largely an attempt to relitigate the decision of the D.C. Circuit.  Id.

Berman also moved for summary judgment, arguing that a lump-sum payment could not

constitute a "contribution to or supplementation of salary" as a matter of law.  Id. at 171-73.

This Court disagreed.  Id.  Both summary judgment motions were therefore denied, and the case

proceeded to trial.

At trial, no party disputed that POGO had made, and Berman had accepted, a payment. The trial therefore focused on whether that payment had been made "as compensation for [Berman's] services as an officer or employee of the executive branch of the United States Government." See 18 U.S.C. § 209. To prove the payment had been made as compensation for Berman's government work, the United States called, among other witnesses, Berman, Brian, and Theodore Heintz. Berman testified that he had written several memoranda on oil royalty valuation issues and sent them to his superiors. Tr. Day 2 at 187-88. He explained that he had not been assigned to analyze oil royalty valuation issues, but that he had undertaken the analysis on his own initiative, with his supervisor's approval, because he was interested in the oil market. Tr. Day 2 at 91, 98-99. At some point around 1993, Berman testified, his supervisors told him "not to do any further work" on oil royalty valuation issues. Tr. at 101-02. Berman acknowledged that he had written several of the memoranda cited in POGO's investigative reports, and stated that POGO's payment to him was an award for his efforts "to bring the undervaluation issue to the attention of people within the Department of the Interior." Tr. Day 3 at 160; see also POGO VI, 543 F. Supp. 2d at 58.

Brian's testimony was largely consistent with Berman's. She explained that Berman had helped her understand the issues surrounding oil royalty valuation and given her advice on how to prepare her FOIA requests. Tr. Day 1 at 136. She also testified that the payment was "at least in part . . . for Mr. Berman's years of bringing this issue, the undervaluation of oil royalties, to the attention of his supervisors," but that Berman's superiors had ignored his efforts. Tr. Day 2 at 77; see also Tr. Day 1 at 211-13; Tr. Day 2 at 45. In sum, she stated, POGO had paid Berman

and one other government employee because "I thought it was the right thing to do . . . I wanted them to know that I wasn't going to forget that they had been the whistle-blowers." Tr. Day 2 at 9.

Heintz testified that he had been Berman's supervisor from the mid-1980s to mid-1990s. Tr. Day 2 at 124, 137. Heintz explained that Berman was the "lead analyst" on oil royalty issues at the DOI for "roughly 10 years from the mid-80s to the mid-90s." Tr. Day 2 at 81. He identified several of Berman's memoranda on oil royalty valuation issues, and testified that he had reviewed them and passed them up the line to his superiors. Tr. Day 2 at 96-102. He also testified that preparation of the memoranda was part of Berman's "official job responsibilities," Tr. Day 2 at 102, and that the DOI leadership had "considered [Berman's] analysis but did not accept the recommendations that Mr. Berman was making." Tr. Day 2 at 88. On vigorous cross-examination by the defense, Heintz admitted to some uncertainty about the timing and extent of Berman's participation on oil royalty issues. He conceded that his deposition statement that Berman had worked on an interagency task force on oil royalty valuation was wrong, and that he had merely assumed that Berman was involved because of his expertise on the issues. Tr. Day 2 at 136; see also POGO VI, 543 F. Supp. 2d at 58. Heintz also admitted that he was unsure when Berman had been told to stop working on oil royalty valuation issues. Tr. Day 2 at 131, 141, 166-75.

In response to the government's evidence, defendants called only two witnesses. Mark Guiton discussed Berman's appearance before Congress to testify on oil royalty valuation issues. Guiton, a former Congressional staffer who had arranged the oil royalty hearing, explained that he, not anyone at DOI, had suggested that Berman appear as a witness at the hearing. Tr. Day 4

6

at 9-10.  He did so because "Berman seemed to have both the knowledge [on oil royalty

valuation] and he had a lot of evidence of the department not pursuing this issue."  Tr. Day 4 at

10.  Finally, Lon Packard, outside counsel for POGO, testified that he had notified a DOJ

attorney about the planned payment to Berman before making the payment.  Tr. Day 4 at 25-26.

He acknowledged, however, that he had not asked for permission to make the payment.  Tr. Day

4 at 36.

　　　In its closing argument, the government argued that it had successfully shown that POGO

paid Berman "as compensation for his services as an officer or employee of the executive branch

of the United States Government."  POGO VI, 543 F. Supp. 2d at 59 (quoting 18 U.S.C. § 209).

The government emphasized Heintz's testimony that Berman's assigned duties had included oil

royalty valuation issues, and pointed out that POGO's investigative reports cited memoranda that

Berman wrote "on government time while [he was] drawing a salary from DOI."  Id.  The

government also stressed that Brian had testified that the purpose of POGO's payment was

"to compensate individuals who had been advocating . . . for years within the government."  Id.

at 59.  Defendants countered that Heintz's credibility was suspect and that, far from being

assigned to work on oil royalty valuation issues, Berman was "expressly instructed to cease

work[]" on those issues by his superiors.  Id.  After brief deliberation, the jury found against both

defendants.  Id. at 60.

　　　After trial, the government moved for summary judgment against Berman on its common

law claims, including Count III, its breach of fiduciary duty claim.  This Court concluded that

"the same facts that support the jury verdict" and Berman's undisputed violation of "numerous

Office of Government Ethics regulations" supported the government's contention that Berman

had breached his fiduciary duty to his employer.  POGO VII, 572 F. Supp. 2d at 75-77.  The

Court declined, however, to award the traditional remedy for a breach of fiduciary duty –

disgorgement – because it had already ordered Berman to pay back the entire $383,600 sum

based on his violation of § 209.  Id. at 77.

Both defendants appealed, focusing on the § 209 count and arguing primarily that the

jury instructions on intent were flawed.  This Court had instructed the jury that it could "consider

what services POGO subjectively intended the payment to be for, and what [services] Mr.

Berman believed that payment was for," but it could not consider whether either defendant

subjectively intended that payment be for Berman's "services as an officer or employee of the

executive branch of the United States Government."  Tr. Day 5 at 98-99.  That is, the jury was

instructed that the parties' intent might determine whether the payment was meant to be

compensation for Berman's work on oil royalty valuation, but whether oil royalty valuation

analysis was part of Berman's official government work was an objective fact to be determined

without reference to the parties' intent.  As the D.C. Circuit summarized:

> This meant, for example, that the jury was permitted to determine whether POGO
> intended its payment to be compensation for Berman's internal government
> memoranda (as the government would have it), or instead for his generalized
> whistleblowing activities (as POGO would have it). But it also meant that the jury
> was not permitted to consider whether POGO knew that either kind of service
> (and particularly the latter) was actually part of Berman's government duties.

POGO VIII, 616 F.3d at 566.  Before this Court and on appeal, defendants argued that the jury

was required to consider defendants' subjective intent both in determining what the payment was

for, and in determining whether that work was Berman's official government work.

The D.C. Circuit agreed.  It began by observing that § 209 does not contain an explicit

mens rea requirement.  But because § 209 can be either a civil or a criminal statute, and a court

8

"must presume that criminal statutes and regulations contain a <u>mens rea</u> element unless otherwise clearly intimated in the language or legislative history,'" the court of appeals held that the presumption of a <u>mens rea</u> element applied even in this civil lawsuit.  <u>Id.</u> at 549 (quoting <u>United States v. Sheehan</u>, 512 F.3d 621, 629 (D.C. Cir. 2008)) (brackets omitted).  The court also noted that an intent requirement was "necessary to separate wrongful conduct from otherwise innocent conduct."  <u>Id.</u> at 550 (internal quotation marks omitted).  For instance, the court wrote, "a parent's monthly checks to a child [employed by the federal government] could be construed as violating § 209" without an intent requirement, because "only the parent's <u>intent</u> distinguishes payments to help cover the rent from payments to subsidize what the parent regards as an insufficient public-sector salary."  <u>Id.</u> Finally, the D.C. Circuit explained that an intent requirement was "necessary to distinguish between lawful and unlawful public service awards," and cited several memoranda by the Office of Legal Counsel ("OLC") and the Office of Government Ethics ("OGE") that held that "a <u>bona fide</u> award for public service or other meritorious achievement" would not violate § 209.  <u>Id.</u> at 551 & nn.7-8.

The court of appeals held that § 209 has a general rather than a heightened intent requirement, i.e., that the government must show that the defendant "know[s] that his act has the characteristics bringing it within the scope of the statute," but need not show a willful violation of the statute.  <u>Id.</u> at 552-53 (brackets, internal quotation marks, and citation omitted).  The court also explained that the intent requirement applied to each element of § 209, because "the evil Congress sought to prohibit [is] payment intended as compensation not just for 'services,' but for 'services as an officer or employee of the executive branch.'"  <u>Id.</u> at 557.  Hence, the government must prove that the payor intends to compensate the employee for <u>government</u> work, not just any

work done by someone who happens to be a government employee.  Similarly, the payee must

intend to be compensated for his actual government work, not work outside his official duties.

Id. at 559.

Finally, the court of appeals noted in a footnote that "[b]ecause [the district court's

conclusion on the fiduciary duty count] appears to have been largely premised on Berman's

now-vacated liability under § 209(a), we leave this issue for the court's reconsideration upon

remand."  POGO VIII, 616 F.3d at 562 n

The court of appeals then vacated the jury verdict and remanded the case to this Court "to

conduct further proceedings consistent with this opinion."  Id. at 566.  On remand, the United

States has moved for summary judgment against Berman and Berman has cross-moved for

summary judgment against the United States –  a surprising situation, given the posture of this

case and the D.C. Circuit's prior opinion holding that the case was not amenable to summary

judgment.  See POGO II, 454 F.3d 306.  Berman argues that the D.C. Circuit effectively found

for him as a matter of law on Count I.  See Motion for Summary Judgment by Robert A. Berman

[Docket Entry 151] ("Berman's MSJ").  He also moves for dismissal, arguing that the

government violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose exculpatory

evidence, improperly coached a witness, and suborned perjury.  See Motion for Dismissal and

Sanctions [Docket Entry 150] ("Berman's MTD").  For its part, the government argues that new

evidence – specifically, Berman's trial and post-trial admissions – shows that there is no longer

any genuine dispute of material fact as to Count I, and hence it is entitled to summary judgment

as a matter of law.  See Motion for Summary Judgment Against Robert A. Berman [Docket

Entry 148] ("Gov't MSJ").  In the alternative, the government argues that this Court should grant

10

summary judgment against Berman on Count III, the breach of fiduciary duty claim  Id.  The

Court will first consider both of Berman's motions, then the government's motion for summary

judgment.

## STANDARD OF REVIEW

Summary judgment is appropriate when the materials in the record show that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56.  In determining whether there exists a genuine issue of material fact

sufficient to preclude summary judgment, the court must regard the non-movant's statements as

true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish

more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.

Thus, the non-moving party cannot rely on mere speculation or compilation of inferences to

defeat a motion for summary judgment.  See Hutchinson v. Cent. Intelligence Agency, 393 F.3d

226, 229 (D.C. Cir. 2005).  Nor can the non-moving party rely on conclusory statements with no

evidentiary basis to establish a genuine issue of material fact.  See Ass'n of Flight Attendants v.

Dep't of Transp., 564 F.3d 462, 465 (D.C. Cir. 2009).  "If the evidence is merely colorable, or is

not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50

(citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence

on which the jury could reasonably find for the [non-movant]." Id. at 252.

## ANALYSIS

### I.  Berman's Motion for Summary Judgment

Berman, currently representing himself pro se, argues that (1) there is no genuine dispute

that POGO's payment to him was a bona fide public service award and (2) "the explicit finding by the D.C. Circuit makes a bona fide public service award not within the ambit of 18 U.S.C. § 209."  Berman's MSJ at 9-10.  He also contends that "there is no dispute that the payment he received from POGO was an award for whistleblowing," and that the caselaw clearly holds that whistleblowing cannot be part of an employee's duties, so the payment could not have been compensation for his government duties.  Id. at 8, 16-18.  Hence, Berman concludes, he is entitled to judgment as a matter of law.

These arguments are unpersuasive.  As a preliminary matter, it is an overstatement to say that the D.C. Circuit clearly held that a bona fide public service award would not violate § 209. The issue of public service awards arose in the D.C. Circuit's discussion of whether § 209 contains an intent requirement.  See POGO VIII, 616 F.3d at 551 & nn. 7-8.  The court pointed to, among other things, various memoranda by the OLC and OGE stating that public service awards are exempted from § 209 because such awards are "motivated by a disinterested desire to honor distinguished public service" and are not intended to supplement a government employee's salary.  Id.; see also 8 Op. Off. Legal Counsel 143, 144 (1984).  Based in part on these memoranda, the court of appeals decided that § 209 does contain an intent requirement.  The court had no occasion, however, to decide precisely what constitutes a bona fide public service award and whether such an award could ever violate § 209.

More importantly, even if it were perfectly clear that a bona fide public service award could not violate § 209, it is vigorously disputed whether POGO's payment to Berman was actually a bona fide public service award intended to recognize Berman's whistleblowing activities, rather than a prohibited contribution to Berman's salary.  See Gov't Resp. to Berman's

Stmt. of Material Facts [Docket 157] at 1 ("The United States does dispute the characterization of this payment as a 'public service award'.  The payment was a share of POGO's proceeds from qui tam litigation that, by 'private agreement' in 1996, POGO had agreed to share with Mr. Berman to 'compensate[]' him for work he had been doing for years at the Department of Interior.").  Indeed, that question was the reason the case proceeded to trial, and it is disingenuous for Berman to argue the issue is undisputed.

Berman claims that it is now obvious that the payment was a public service award because the D.C. Circuit described POGO's payment as a public service award "without comment."  Reply in Support of Berman's MSJ [Docket Entry 159] at 3-4.  But the D.C. Circuit was only describing the notation on the check and the accompanying cover letter; it was not agreeing that the check actually was a public service award.  See POGO VIII, 616 F.3d at 546 ("The face of the check indicated that it was a 'Public Service Award,' and the accompanying letter explained that POGO was awarding it to Berman for his 'decade-long public-spirited work to expose and stop the oil companies' underpayment of royalties for the production of crude oil on federal and Indian lands.'").  Berman also rehashes the evidence presented at trial to support his argument that the payment was a public service award.  See Berman's MSJ 15-16, 18.  The only new evidence Berman presents is a 1999 memoranda by William Bettenberg, Berman's second level supervisor, that states that "Berman had no assigned work in [the area of oil royalty valuation] and probably had not had for several years."  Berman's MTD, Ex. 1, at 3; see Berman's MSJ at 16.  This document may help Berman's case, but it certainly is not enough to show that there is no genuine dispute over whether the payment was a bona fide public service award.  The government has never argued that POGO's 1998 payment to Berman was for

ongoing work, but rather that it was compensation for government work he had performed in the

past.  Hence, a 1999 statement that Berman had no oil royalty valuation work at that time and

"probably" had not had such work for "several years" does not foreclose the possibility that

POGO compensated Berman for his official government duties in the late 1980s and early 1990s.

The government also correctly points out that POGO's payment to Berman is not a public

service award under the criteria set out in 5 C.F.R. § 2635.204(d)(1).  Although that regulation

applies to a different statute, both the OLC and the OGE have relied on it in distinguishing

between compensation for government services and permissible bona fide public service awards

in the § 209 context.  See OGE Informal Advisory Memorandum 02 x 4 (July 1, 2002), 2002 WL

32100961, at Example 19 (following criteria laid out in 5 C.F.R. § 2635.204(d)(1)); 21 U.S. Op.

Off. Legal Counsel 204 (Oct. 28, 1997), 1997 WL 33100655, at *4 (citing 5 C.F.R. §

2635.204(d)(1) and noting that some payments to federal employees are public service awards,

not "compensation for services to the government").  Under § 2635.204(d)(1), bona fide public

service awards are those that "are part of an established program of recognition . . . [u]nder

which awards have been made on a regular basis or which is funded, wholly or in part, to ensure

its continuation on a regular basis; and . . . [u]nder which selection of award recipients is made

pursuant to written standards."  Additionally, § 2635.204(d)(1) requires that an employee obtain

advance written authorization before accepting a bona fide public service award over $200.

POGO's payment to Berman does not fit within those criteria.  The payments to Berman and one

other government employee are apparently the only such awards POGO has made, there is no

funding "to ensure . . . continuation on a regular basis," the recipients were not selected pursuant

to written standards, and Berman did not obtain advance written authorization before accepting

14

the payment.  Hence, Berman's claim that POGO's payment was a "public service award" in the

formal sense that OLC and OGE have used that term is undermined by the very guidance on

which he relies. While a jury could reasonably find that POGO's payment to Berman was a

"public service award for whistleblowing" in an informal sense, the government is correct that

Berman cannot defend the payment simply by pointing to 5 C.F.R. § 2635.204(d)(1).[1]

　　　Berman's second argument is that "there is no dispute that the payment he received from

POGO was an award for whistleblowing" and that "the disclosures of a whistleblower cannot be

part of the official's government duties . . . . The two classifications of activities are mutually

exclusive."  Berman's MSJ at 8, 16-18.  This argument is doubly wrong.  First, as already

explained, the dispute over whether the payment was for whistleblowing is the central question

in this case.  The government produced "impressive" evidence at trial to show that Berman's

work on oil royalty valuation issues was an assigned part of his job, and not, as Berman would

have it, work that he was forbidden to do.  See POGO II, 454 F.3d at 311; POGO VI, 543 F.

Supp. 2d at 65-67.  Second, the caselaw Berman cites for the proposition that "the disclosures of

a whistleblower cannot be part of the official's government duties" does not help him.  All of the

cases Berman cites are similar, so the Court will only review one here.  In Skare v. Extendicare

_____

　　　[1]  The government also contends that Berman's claim that the payment does not violate §
209 because it is a public service award is an affirmative defense, and therefore had to be
pleaded several years ago.  Gov't Opp. to Berman's MSJ [Docket Entry 157] at 2-8.  Though it
need not resolve this issue, the Court notes that it is not convinced that Berman's argument is an
affirmative defense.  A defendant making an affirmative defense – for instance, claiming that the
statute of limitations has run or that the government is estopped from pursuing the case – is
claiming that he must prevail even if everything the plaintiff alleges is true.  But here, Berman is
claiming that POGO did not compensate him for his government duties, but rather gave him a
public service award for whistleblowing.  Reply in Supp. of Berman's MSJ [Docket Entry 159] at
2. In other words, Berman is denying that the government can prove a key element of § 209, not
arguing that this prosecution is barred even if the government can prove each element of § 209.

Health Servs., Inc., 515 F.3d 836 (8th Cir. 2008), the plaintiff claimed that her employer had retaliated against her in violation of Minnesota's whistleblower protection statute "for her reporting [of] violations of various laws, regulations, and company policies." Id. at 838. The Eighth Circuit found, however, that the plaintiff's job duties included reporting any unlawful behavior that she observed, so "the nature of Skare's internal complaints was to carry out her regular job duties as opposed to exposing wrongdoing." Id. at 841. It therefore affirmed the grant of summary judgment to the employer, because it found that "[t]he whistleblower statute does not grant protection to an employee whose job duties require him or her to ensure legal compliance." Id.

The lesson Berman draws from Skare and similar cases is that "the disclosures of a whistleblower cannot be part of the official's government duties." See Berman's MSJ at 16. But the rule actually established by these cases is different: whistleblowing that is part of an employee's official duties cannot form the basis for an action under a whistleblower protection statute. Contrary to Berman's argument, the cases illustrate that "whistleblowing" in the broad sense that Berman uses it often is part of an employee's job. Just as the plaintiff in Skare was assigned to report any legal violations she observed, Berman was assigned to analyze policy issues – potentially including fraudulent behavior by regulated entities – that were relevant to the mission of the Department of the Interior. Berman's official job duties, therefore, could have included whistleblowing, and a payment for whistleblowing could thus have been compensation for his government services.

Because there are genuine disputes about whether POGO's payment should be characterized as a public service award for whistleblowing or as compensation for Berman's

government duties, summary judgment in his favor is not appropriate.  Berman's motion is therefore denied.

## II.  Berman's Motion to Dismiss and for Sanctions

In his motion to dismiss, Berman contends that the case should be dismissed because of the government's misconduct or, in the alternative, that this Court should impose sanctions on the government and issue various orders governing the United States's future litigation of this case. His argument is based on three instances of alleged impropriety.  First, he argues that the United States suppressed exculpatory evidence – specifically, a 1999 memorandum by William Bettenberg – in violation of  Brady v. Maryland, 373 U.S. 83 (1963), and Fed. R. Civ. P. 26. Second, he argues that the government impermissibly coached Heintz to testify falsely.  Third, he argues that the government suborned Heintz's perjury.  None of these arguments is persuasive.

Berman claims that Brady and its progeny, which require the government to disclose exculpatory or impeachment evidence to criminal defendants, apply in this civil case because 18 U.S.C. § 209 is a dual civil/criminal statute located within the criminal code.  This argument has some force. The fact that violations of § 209 can be prosecuted criminally has played an important role at several points in this case: the D.C. Circuit presumed that the statute must include a mens rea requirement, POGO VIII, 616 F.3d at 549; this Court permitted the defendants to give a "theory of the defense" jury instruction, Tr. Day 5 at 4-9; and the Supreme Court has invoked the rule of lenity in interpreting § 209 in the civil context, Crandon v. United States, 494 U.S. 152, 158 (1990).  Nonetheless, having reviewed the sparse caselaw on when Brady applies in civil cases, the Court concludes that the government had no Brady obligations here.

The Court has only located three civil cases where a court has held that <u>Brady</u> applies. The best known is <u>Demjanjuk v. Petrovsky</u>, 10 F.3d 338, 353 (6th Cir. 1993), where the Sixth Circuit held that "<u>Brady</u> should be extended to cover denaturalization and extradition cases where the government seeks denaturalization or extradition based on proof of alleged criminal activities of the party proceeded against." The defendant in <u>Demjanjuk</u> was denaturalized based on the trial court's conclusion that he had committed certain criminal acts, and he was then extradited to Israel for trial on those acts. <u>Id.</u> at 339. The Sixth Circuit noted that the case had been investigated by attorneys in the criminal division of the Department of Justice, and they "approach[ed] these cases as prosecutions." <u>Id.</u> It then found that the government had withheld a large amount of important material, and observed that "[t]he consequences of denaturalization and extradition [in this case] equal or exceed those of most criminal convictions." <u>Id.</u> at 354. Based on all of those factors, the Sixth Circuit found that the government had to comply with <u>Brady</u>. The Sixth Circuit later limited the holding of <u>Demjanjuk</u>, writing that its "seemingly broad language must be read in the context of a case that involved an unusual set of circumstances." <u>In re Extradition of Drayer</u>, 190 F.3d 410, 414 (6th Cir. 1999).

In <u>United States v. Edwards</u>, 777 F. Supp. 2d 985 (E.D.N.C. 2011), the court concluded that <u>Brady</u> applied to civil commitment proceedings for sexual offenders. There, the government had failed to disclose a report of its expert opining that the respondent did not meet the "sexually dangerous criteria for civil commitment." <u>Id.</u> at 989. The government's failure to disclose the report resulted in the respondent "remain[ing] in custody for sixth months after the Government had evidence that they would be unable to carry their burden" at a civil commitment hearing. <u>Id.</u> The court held that "[o]rdinary rules of civil procedure are inadequate here because civil

18

commitment hearings are not an ordinary civil matter.  At issue is not an issue for damages or equitable relief.  Instead, the issue is whether someone will be locked away."  <u>Id.</u> at 994.  In the court's view, the respondent in the civil commitment proceeding before it needed the protections of <u>Brady</u> even more than criminal defendants did, because the government was permitted to detain him indefinitely without a finding of probable cause.  <u>Id.</u> at 995.  The court therefore found the case similar to <u>Demjanjuk</u> and dissimilar to ordinary civil proceedings where "merely money or damage to reputation" are at stake.  Hence, it held that the government was obliged to comply with <u>Brady</u>.  <u>Id.</u> at 997-98.

Finally, in <u>EEOC v. Los Alamos Constructors, Inc.</u>, 382 F. Supp. 1373, 1374 (D.N.M. 1974), the government filed a "skeleton complaint" charging the defendant with employment discrimination.  The government then ignored the court's order for it to set forth the facts on which it relied, refused to answer most of the defendant's interrogatories, and, in essence, forced the defendant to litigate "against nothing but a phantom legal conclusion sketched out in the complaint."  <u>Id.</u>  After reminding the government attorneys that "receipt of a government paycheck is not a license to interfere with or to attempt to interfere with the fair administration of justice" and that the government's interest "is not that it shall win a case, but that justice shall be done," the court ordered the government to provide the defendant with certain discovery.  <u>Id.</u> at 1383, 1386.  In a footnote, the court added that "<u>Brady v. Maryland</u> . . . orders that exculpatory information must be furnished a defendant in a criminal case. A defendant in a civil case brought by the government should be afforded no less due process of law."  <u>Id.</u> at 1383 n.5.

In many other cases, however, courts have found that <u>Brady</u> is not applicable in civil proceedings.  <u>See, e.g.</u>, <u>NLRB v. Nueva Eng'g, Inc.</u>, 761 F.2d 961, 969 (4th Cir. 1985) (noting

that "[a]n action for violations of the National Labor Relations Act is civil in nature, does not

involve potential incarceration and violation of the Act does not carry with it the stigma of a

criminal conviction"); United States ex. rel. (Redacted) v. (Redacted), 209 F.R.D. 475, 481-83

(D. Utah 2001) (Brady does not apply in false claims act litigation, despite "potentially serious

consequences" for defendants, because "the consequences of a civil case are fundamentally

different from criminal sanctions"); see also id. at 482 (collecting cases).  Those cases rejecting

Brady's applicability are more germane here.

      What is at stake in this case is money and reputation, not "whether someone will be

locked away."  See Edwards, 777 F. Supp. 2d at 994.  It cannot be said that the consequences of

this case "equal or exceed those of most criminal convictions."  Demjanjuk, 10 F.3d at 354.  Nor

is this a case where the government's litigation tactics have been egregious or designed to make

the case virtually impossible to defend.  See Los Alamos Constructors, Inc., 382 F. Supp. at

1374.  This case is therefore more like ordinary civil cases where Brady has been found not to

apply than it is like the rare exceptions.

      Additionally, as the government points out, the policy reasons for Brady do not apply

here.  Brady is necessary in the criminal context because criminal defendants are entitled only

"to rather limited discovery."  Degen v. United States, 517 U.S. 820, 825 (1996).  Civil litigants,

on the other hand, are "entitled as a general matter to discovery of any information sought if it

appears 'reasonably calculated to lead to the discovery of admissible evidence.'"  Id. at 825-26

(citing Fed. Rule Civ. P. 26(b)(1)).  Berman would have been entitled to the Bettenberg memo if

his attorney had asked for it or composed a discovery request broad enough to capture it.  The

government asserts, and Berman does not dispute, that he did not do so.  Because Berman could

have availed himself of the ordinary civil discovery rules, the Court concludes that the government was not obliged to comply with <u>Brady</u> in this civil lawsuit, even though § 209 is located in the criminal code.

The Court notes that even if <u>Brady</u> did apply, the Bettenberg memorandum would likely not be material.  Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985).  Here, the evidence at trial clearly showed that Berman was told to stop working on oil royalty valuation issues at some point in 1997 or 1998 at the latest.  Bettenberg's statement confirms that fact, not introduces it for the first time. Hence, it would merely have been cumulative of other evidence in the case.

In his second argument, Berman points out that Heintz testified at his deposition that he did not remember when Berman was told to stop working on oil royalty valuation issues, but testified at trial that Berman had been told to stop work in that area in 1997 or 1998.  Berman's MTD at 12-13.  Under cross-examination, Heintz admitted that he was not sure about the date, and that Berman could have been excluded from oil royalty valuation work as early as 1993 or 1994.  Heintz testified that his statement that Berman was excluded in 1997 or 1998 was based on his review of various documents, but that he had no "independent memory of a date on which that occurred," Tr. Day 2 at 132, and that he "do[esn't] remember dates, generally speaking," Tr. Day 2 at 135.  Heintz explained that he "th[ought] remembering a date is knowing when it happened," and he believed that he knew when Berman was excluded from oil royalty valuation work based on his review of the pertinent documents.  Tr. Day 2 at 141.

Berman contends that it is self-evident from Heintz's testimony that he was improperly coached.  He also points to portions of Heintz's testimony where, Berman contends, Heintz admitted to improper coaching:

> Q. Because you recall in your deposition, don't you, that every time -- one of the issues that I was asking you about was could you remember when Mr. Yeager told you that, to have him stop. Remember that?
> A. Yes.
> Q. And remember how after each exhibit I would ask you, does that help you remember? Remember my asking you that?
> A. I remember you asking me that from time to time.
> Q. And you said, no, it doesn't. Wasn't that your answer?
> A. Yes. And I've been helped to think about how to treat documents that refresh one's memory. What I was trying to do in those answers was to tell you I didn't remember it independent of the documents. I don't have a memory of dates independent from documents because I don't remember dates. But if documents are put in front of me with dates on them, they then help me to remember, after which I think it's appropriate to say now I remember, there is a date for that event. . . .  I had a different understanding of what it meant to refresh one's memory from documents in the legal setting. I'm not a sophisticated person about the law. I was just trying to be helpful and tell people what I knew in as straightforward a way as possible. And when people say do you remember a date and I don't remember a date because I don't remember any dates, I say no, I don't remember a date. Because that's the straightforward answer to give.
> Q. When is it that you got this education of what refreshing recollection means?
> A. In discussion with the Justice Department attorneys and looking at the documents.
> . . .
> Q. And they said to you, we'd really like to know when Yeager told him to stop working on this stuff.
> A. No, they didn't say that.

Tr. Day 2 at 165-67.  On redirect examination, Heintz reaffirmed that the attorneys who helped him prepare had not told him what to say in his testimony.  Tr. Day 2 at 179.

Heintz's testimony may indicate that the DOJ attorneys did not explain the somewhat confusing subject of refreshing recollection as thoroughly as they might have, but it does not show that the DOJ attorneys coached him to lie about the date on which Berman was told to stop

working on oil royalty valuation.  Indeed, if the government actually "coach[ed] Heintz to avoid reflecting any uncertainty in his testimony to the jury," as Berman contends, the coaching was remarkably ineffective.  <u>See</u> Berman's MTD at 13.  Heintz conceded as soon as he was asked that his recollection was based on the documents he had reviewed and that it was possible he had the dates wrong.  Absent any indication of governmental misconduct, rather than witness confusion, this Court will not find that the government attorneys violated their ethical obligations.[2]

Berman also argues that Heintz falsely testified that he supervised Berman for ten years, from approximately 1986 to 1996.  Berman now states that Heintz was not his supervisor from approximately 1988 until 1993, and points to his personnel file to show that other people signed documents as Berman's supervisor between 1988 and 1993.  Berman's MTD at 8-11; <u>see also</u> <u>id.</u> Ex. 3.  In his reply brief, Berman explains that he was transferred to a different job within the DOI from May 5, 1989 until May 20, 1993, and that Margaret Sibley was his supervisor during that time.  Reply in Support of Berman's MTD [Docket Entry 158] at 10-11.  Berman also states that he served in the Director's Office under supervisors Merritt Sprague and Maryanne Bach after he left Sibley's team and before he rejoined Heintz's.  <u>Id.</u>  Berman argues that whether Heintz was actually his supervisor is a critical issue in this case, because Heintz was the government's chief witness on what Berman's actual job duties were.  <u>Id.</u> at 14.

To succeed on this claim, Berman must show by clear and convincing evidence (i) that

_____

[2]  Berman also points to his attorney's lengthy cross-examination about whether Heintz changed his definition of the words "review" and "monitor," which he had previously used to describe Berman's job responsibilities.  Berman contends that Heintz's changing definition of those words shows that Heintz was improperly coached.  In this Court's view, however, the testimony does not suggest coaching as much as it suggests Heintz's impatience with hyper-technical cross-examination that lacked a clear goal.  <u>See</u> Tr. Day 2 at 114-30.

Heintz's testimony was actually false, and (ii) that the government attorneys knew it was false.

See Shepherd v. Am. Broad. Cos., 62 F.3d 1469, 1472 (D.C. Cir. 1995).  It bears noting that

Berman never even hinted at this issue during trial, either in his own testimony or during the

cross-examination of Heintz.  Heintz repeatedly described himself as Berman's supervisor, and

Berman repeatedly referred to Heintz as his supervisor, without clarifying the dates at issue.

Berman now protests that the omissions were his lawyer's fault, but the Court sees no reason to

assume that Berman's lawyer, who was generally competent and well-prepared, would have

ignored this important issue if his client had prompted him to pursue it.  See Reply in Supp. of

Berman's MTD [Docket 158] at 10 n.2.  And the fact that it would have been so easy to detect a

lie suggests that neither Heintz nor the government attorneys believed that Heintz's testimony

was untruthful.

Leaving aside the fact that Berman is raising this issue very late in the game, the excerpts

Berman has provided from his personnel file do not show by clear and convincing evidence that

Heintz lied about being Berman's supervisor from 1988 to 1993.  To the contrary, the documents

show that Berman at times had more than one supervisor, so there is no reason to assume that

Heintz stopped supervising Berman when he moved to Margaret Sibley's team.  See Berman's

MTD, Ex. 3 at 11.  Additionally, as the government argues, the documents Berman attaches to

his motion are not the yearly personnel evaluations that Heintz testified he completed, but

instead are "application[s] for the Senior Executive Service Candidate Development Program," a

"Summary Rating Form," and various notifications of personnel actions.  Gov't Opp. to Berman's

MTD [Docket Entry 154] at 7.  The fact that Heintz did not prepare these non-standard reviews

does not necessarily mean that Heintz was not Berman's supervisor – or one of them – during the

24

pertinent time period.

Finally, even assuming Heintz was wrong about the period in which he supervised Berman, Berman has not shown by clear and convincing evidence that the government knew the testimony was untruthful.  The government had access to Berman's personnel file, but a review of the documents in that file – at least the ones provided to this Court – does not lead to the clear conclusion that Heintz was not Berman's supervisor from 1988 to 1993.  Moreover, as previously noted, the circumstances suggest that the government believed Heintz's testimony was truthful. Accordingly, the Court denies Berman's motion to dismiss this case or sanction the government for suborning perjury.

### III.  The United States's Motion for Summary Judgment

### A.  Count I

As it did in an earlier summary judgment motion, the United States argues that summary judgment on Count I is appropriate because of "'new' evidence that allegedly eliminates the credibility issues that the D.C. Circuit identified."  POGO IV, 525 F. Supp. 2d at 166.  The government argues generally that Berman's trial testimony supports summary judgment, but it devotes most of its attention to two statements that Berman later made in the course of disputing his termination from the DOI.  The first came in a June 23, 2008 memorandum from Berman to Christine Baglin, the director of the Office of Policy Analysis.  See Gov't MSJ, Ex. 2.  After the now-vacated jury verdict in this case, Berman's supervisor proposed that Berman "[b]e removed from [his] career Government Service position as Economist . . . and from the Federal service," because he had used his "public office for private gain."  Id. at 1.  In explaining that he had not taken POGO's payment as part of a quid pro quo arrangement, Berman wrote:

Section 209 . . . has . . . no requirement that the Government prove that there was some corresponding benefit from me to POGO.  In this case, the POGO award was simply for doing my job well in the past – not for anything I agreed to do for POGO.  Although in January 1998 POGO, Bob Speir and I set out an "agreement" to share whatever recovery POGO might obtain in litigation, the award was expressly premised on the historic performance of my duties and in no way suggested that I had done or would do anything to favor POGO in my government actions in return for the award.  There was no evidence or claim of a <u>quid pro quo</u>[.]

<u>Id.</u> at 3-4.

On September 14, 2009, Berman again discussed POGO's payment in his petition for review of the termination decision before the Merit Systems Protection Board.  Gov't MSJ, Ex 3. There, addressing the Administrative Judge's finding that Berman's "characterization of the award from POGO as a 'public service award' was in conflict with [Berman's] written statement that the award was the result of doing a good job 'in the past,'" Berman wrote: "Both [statements] are true and consistent. [I] did not believe that the payment was in anyway related to [my] current job responsibilities."  <u>Id.</u> at 8.  The government argues that given Berman's 2008 statement, and his express reaffirmation of that statement in 2009, there is no longer any question that Berman accepted the payment "as compensation for his services as an officer or employee of the executive branch of the United States Government."  <u>See</u> 18 U.S.C. § 209.

As the government recognizes, issues of intent and state of mind are generally not amenable to summary judgment.  In certain cases, however – for instance, where there is a clear and uncontradicted statement of intent – summary judgment may be appropriate.  "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."  <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985).  Where "the material undisputed facts compel" a certain conclusion on intent,

26

a court may properly draw that conclusion.  In re McGuirl, 162 B.R. 630, 634 (D.D.C. 1993).

Here, Berman has arguably made conflicting statements about his intent in accepting POGO's payment.  Whether summary judgment is appropriate when a party's own evidence is contradictory is a difficult question.  The issue arises most frequently when a party simply submits an affidavit at summary judgment that flatly contradicts an earlier, damaging statement. In such cases, the rule is clear: "Virtually every circuit has adopted a form of the so-called 'sham affidavit rule,' which precludes a party from creating an issue of material fact by contradicting prior sworn testimony unless the shifting party can offer persuasive reasons for believing the supposed correction is more accurate than the prior testimony."  Galvin v. Eli Lilly & Co., 488 F.3d 1026, 1030 (D.C. Cir. 2007).  This rule is necessary as a matter of common sense: without it, a party could always create an issue of material fact with a self-serving affidavit contradicting an earlier statement.

Although the government cites many cases dealing with sham affidavits, it cites no caselaw discussing the more difficult situation where a party has made inconsistent statements and neither statement is obviously fraudulent.  In those situations, a court must make a more nuanced assessment of whether any of the inconsistent statements can properly be disregarded. See POGO II, 454 F.3d at 313 (refusing to grant summary judgment to United States despite "internal contradictions" in Berman's evidence); see also Scamihorn v. Gen. Truck Drivers, 282 F.3d 1078, 1086 n.7 (9th Cir. 2002).  Here, the government argues that Berman's statements in the termination proceedings must be credited and his prior assertions that he accepted POGO's payment as an award for whistleblowing must be disregarded.  The government points out that the 2008 statement was "made in what must have been a carefully worded statement when Mr.

27

Berman was fighting to retain his Government job following the jury's verdict and this Court's judgment." Gov't MSJ at 4. Because the termination proceeding happened shortly after the trial, the government reasons that "Mr. Berman no doubt was acutely aware of the issues in the case and the elements of a § 209 offense" at the time he composed the letter to Baglin. Id. at 6. Moreover, Berman explicitly reaffirmed that the statements were true a year later. See Gov't MSJ, Ex. 3 at 8.

Berman's assertions certainly cause problems for his defense, and they can easily be read as conceding the key point in the case. Nonetheless, the Court is unpersuaded that they transform this case so significantly by removing a central factual issue so that summary judgment against Berman is now appropriate. First, and most importantly, this is not a "sham affidavit" case. Berman is not using a recent statement to overcome consistent past statements; rather, the government is using a recent statement to contradict Berman's voluminous past testimony that he believed POGO was paying him for whistleblowing. The government is correct that Berman's recent statements were made in a serious context and were likely considered carefully, but the same is true of Berman's contrary sworn statements at his deposition and during the trial. In other words, there is no automatic reason to credit the more recent statements over all of Berman's prior testimony, and none of the sham affidavit caselaw cited by the government is on point. See Richardson v. Jennings, 2006 WL 839423 (S.D. Ill. 2006) ("[W]hile it is true . . . that there are some inconsistencies between Plaintiff's pro-se complaint and his deposition testimony, these inconsistencies do not erase the genuine issues above. Merely because the record is not perfectly consistent . . . does not mean that this Court is free to pick and choose from the facts in the complaint and the deposition transcript, crediting

28

facts helpful to Defendant . . . , while discrediting others . . . . This Court's duty at the

summary-judgment stage, rather, is to survey the entire record – as a whole – to determine

whether genuine issues of material fact exist.").

There are also some reasons to discount the statements Berman made during the

termination proceedings.  First, in Berman's memo to Baglin, he was not discussing whether he

was paid for his official job duties or for whistleblowing.  Rather, he was trying to explain as

clearly as possible that he did not take the payment as a quid pro quo, i.e., that the payment was

for his past activities rather than for something he would do for POGO in the future.  See Gov't

MSJ, Ex. 2 at 3-4.  A jury could reasonably conclude that Berman was being imprecise about the

issue now before this Court in an effort to be clear about the issue in the termination proceeding.

This is particularly true given that the termination proceeding was specifically based on the jury

verdict.  Berman could reasonably have decided that relitigating the § 209 issue would not aid

him in the termination proceeding, and that he simply needed to show why he should retain his

job despite the jury's verdict.  Finally, Berman now explains that the statement's reference to

"doing my job well in the past" and "the historic performance of my duties" did not refer to "any

official, assigned duties of a Senior Economist at Interior." Berman's Opp. to Gov't MSJ [Docket

Entry 156] at 35-36 (internal quotation marks omitted).  Rather, he explains, the statement

"merely reiterates the same 'generalized whistleblowing activities' in which [I] felt duty-bound,

as a conscientious public servant, to continuously advocate, on behalf of taxpayers generally,

over many years.  Rather than as payment for any assigned duties, the award was in recognition

of the past advocacy and whistleblowing." Id.  This explanation may not convince a jury, but it

is not so unbelievable that no reasonable jury could credit it.[3]

Because a reasonable jury could choose to credit Berman's prior assertions over those made in his termination proceeding, the recent statements do not resolve the credibility issues that concerned the D.C. Circuit.  The government also argues, more generally, that Berman's statements at trial show that there is no longer any genuine issue of fact, but this contention is unconvincing in light of the fact that the D.C. Circuit found that the error in the jury instructions was not harmless.  POGO VIII, 616 F.3d at 560.  If the evidence had been so strong as to remove any doubt that POGO and Berman violated § 209, the D.C. Circuit would not have remanded the case to this Court.  Moreover, the D.C. Circuit evidently envisioned that remand would result in a new trial.  See id. at 562 n.20 (declining to address Berman's evidentiary challenges because "it is not possible to predict what the record will look like after a new trial").

### B.  Miscellaneous Issues

 Berman raised three issues related to Count I in his opposition to the government's summary judgment motion that were not directly responsive to the government's arguments.  The Court will briefly address each issue.

First, Berman argues that "[a]lthough the D.C. Circuit rejected Berman's argument that a lumpsum payment could never be a supplement to salary . . . , it certainly did not go so far as to say that to violate § 209 the payment did not have to meet any objective measure of salary."

---

[3]  As previously noted, in his petition for review to the Merit Systems Protection Board, Berman explained that his characterization of the payment as a "public service award" was not in conflict with his statement that the payment was premised on the historical performance of his duties because he "did not believe that the payment was in any way related to his current job responsibilities."  Ex. 3 at 8.  This explanation may not be helpful to him, because he and POGO would still have violated § 209 if POGO's payment was for his past official job duties.  Whether to credit this explanation for Berman's 2008 statement or the explanation in his brief is simply one more question for a jury to evaluate.

Berman Opp. to Gov't MSJ [Docket Entry 156] ("Berman Opp.") at 19-20.  Berman then repeats his previous arguments that the lump-sum payment was not salary because it was not distributed periodically or tied to the time he spent on oil royalty valuation issues.  Both this Court and the D.C. Circuit have already held that the lump-sum payment at issue here could constitute salary.  POGO IV, 525 F. Supp. 2d at 171-74; POGO VI, 543 F. Supp. 2d at 61; POGO VIII, 616 F.3d at 560-62.  It is the jury's role to decide whether POGO did, in fact, "ma[k]e a contribution to or supplementation of Mr. Berman's salary."  See Tr. Day 5 at 97 (jury instruction).  Having determined that the lump-sum payment could constitute a contribution to salary as a matter of law, the Court will not supplant the jury's role and decide whether it actually did so.

Second, Berman argues that the D.C. Circuit's opinion holds that the government must link POGO's payment to some concrete act that Berman took as a DOI employee.  Berman Opp. at 5-10, 25-27, 35-36.  Berman misreads the opinion.  The D.C. Circuit's references to a concrete act occurred in its discussion of a case that dealt with violations of 18 U.S.C. § 201(c)(1)(A), which does require a link between the payment and a specific, official act.  The court did not hold, however, that the requirement also applies in the § 209 context.  See POGO VIII, 616 F.3d at 550.

Lastly, Berman contends that the D.C. Circuit held that the government must show that he willfully violated § 209.  Berman's Opp. at 21-24.  Although the court did discuss willful or "heightened intent" violations, see 616 F.3d at 552 & n.10, it ultimately held that the lack of an explicit scienter requirement in § 209 meant that general intent, not heightened intent, is the required mens rea.  Id. at 552-53.

## C.  Count III

In the alternative, the government contends that it should now be granted summary judgment on its breach of fiduciary duty claim. Gov't MSJ at 12-13; see Compl., Count III, ¶¶ 48-51. In its post-trial opinion in this matter, this Court concluded that "the same facts that support the jury verdict" together with Berman's undisputed violation of "numerous Office of Government Ethics regulations" also supported the government's contention that Berman had breached his fiduciary duty to his employer. POGO VII, 572 F. Supp. 2d at 75-77. The Court declined, however, to award the traditional remedy for a breach of fiduciary duty – disgorgement – because it had already ordered Berman to pay back the entire $383,600 sum based on his violation of § 209. Id. at 77. The Court noted that "should the jury verdict be reversed on appeal, this assessment could change." Id. at 77 n.4. On appeal, the D.C. Circuit wrote that "[b]ecause [the court's conclusion on the fiduciary duty count] appears to have been largely premised on Berman's now-vacated liability under § 209(a), we leave this issue for the court's reconsideration upon remand." POGO VIII, 616 F.3d at 562 n.20.

The jury verdict has now been reversed on appeal, and this Court will accordingly reconsider its decision on Count III. The Court, rather than a jury, is the factfinder on this equitable claim. In this case, however, the Court finds that there are no disputed material facts relating to the breach of fiduciary duty claim, and that the claim may therefore be resolved on summary judgment.

In its complaint, the government alleges that "[a]s an employee of the federal Government, Mr. Berman has a fiduciary duty to be loyal to the United States and to be bound by the ethics rules and regulations applicable to such employees," including, inter alia, "refraining from holding financial interests that conflict with the conscientious performance of

duty," "refraining from accepting any payments from any person or entity whose interests may be substantially affected by the performance or nonperformance of the employee's duties," "refraining from outside activities that conflict with official Government duties and responsibilities," "endeavoring to avoid any actions which create the appearance that the employee is violating the law or ethical standards," and "refraining from accepting gifts from prohibited sources, including entities that have interests which may be substantially affected by performance or nonperformance of the employee's official duties."  Compl. ¶ 50 (paraphrasing 5 C.F.R. § 2635.101).

"[F]ederal 'common law protections against breach of fiduciary duty extend to the principal-agent relationship' arising out of federal employment."  United States v. Kenealy, 646 F.2d 699, 703 (1st Cir. 1981) (quoting United States v. Kearns, 595 F.2d 729, 732 (D.C. Cir. 1978)).  In United States v. Carter, 217 U.S. 286, 306 (1910), the seminal case on breach of fiduciary duty by a federal employee, the Supreme Court explained:

> The larger interests of public justice will not tolerate, under any circumstances, that a public official shall retain any profit or advantage which he may realize through the acquirement of an interest in conflict with his fidelity as an agent. If he takes any gift, gratuity, or benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received.

The government need not show any "actual damage or abuse of office" to prove a breach of an employee's fiduciary duty, because even the appearance of a conflict undermines the public trust. Kearns, 595 F.2d at 734; Carter, 217 U.S. at 305. Statutes and regulations governing federal employment "provide evidence of the precise nature of [a federal employee's] fiduciary duty." Kenealy, 646 F.2d at 703.

As previously noted, it is hotly disputed in this case whether POGO intended to compensate Berman for his government duties, whether Berman accepted POGO's payment as a supplement to his salary, and what Berman's official duties were.  There is no dispute, however, that POGO agreed to and did pay Berman part of the settlement it received in the qui tam litigation.  Specifically, Brian informed Berman at some point before December 9, 1996, that she intended to share any proceeds of POGO's qui tam lawsuits with him.  Berman testified that he "said yeah, fine, thanks," although he "put no stock in" Brian's promise.  Tr. Day 3 at 8-12.  The minutes of POGO's December 9, 1996 board meeting show that Brian told POGO's board that she intended to share any litigation proceeds with Berman and another government employee. Gov't MSJ, Ex. 5.  On January 5, 1998, POGO and Berman signed an agreement that "put in writing the standing oral agreement" that Berman would receive a share of any litigation proceeds.  Gov't MSJ, Ex. 6.  Then, in November 1998, POGO issued a check for $383,600 to Berman.  POGO IV, 525 F. Supp. 2d at 164; see also POGO II, 454 F.3d at 307.

There is also no dispute that Berman did not inform his ethics officer or anyone else at the DOI when he made the informal oral agreement to share proceeds, when he and POGO signed a written agreement, or when he actually accepted payment.  See Tr. Day 3 at 48; POGO IV, 525 F. Supp. 2d at 167-68.  Berman testified at his deposition that he decided not to consult with Brooks Yeager, his ethics officer, because "I was concerned that I would get a non-objective assessment from Brooks Yeager, and a lot of hollering and screaming, and I decided I was going to pursue another way to check it out."  Gov't Second Mot. for Summ. J. [Docket 43], Ex. 33 at 19.  POGO's counsel Lon Packard did inform an attorney at the Department of Justice shortly before making the payment to Berman, but Packard testified without contradiction that he

merely notified the attorney of the payment, rather than asking permission to make the payment. Tr. Day 4 at 25-26, 36; see also Berman's Opp. to the Gov't Mot. for Post-Trial Judgment on Counts III, IV, and V [Docket 115] ("Berman Count III Opp.") at 5.  Based on Packard's call and "some research" Berman had done, he "made the call that it was okay" to accept the payment from POGO.  Gov't Second Mot. for Summ. J., Ex. 33 at 19.

Whether Berman's "official duties" included any tasks that had the potential to affect POGO's interests is a more difficult question.  Indeed, much of the dispute at trial centered on what Berman's official duties included and when his supervisors formally told him to stop working on oil royalty valuation.  Nonetheless, the Court finds that there are two undisputed instances of Berman doing assigned work on oil royalty valuation issues – with the potential to affect the lawsuits brought by POGO – after he had agreed, formally or informally, to share in the proceeds of those lawsuits.

First, Berman and Bettenberg attended a meeting to discuss a proposed rulemaking on oil royalty valuation issues in December 1996, likely after Berman had been informed that POGO intended to share litigation proceeds with him.  Gov't MSJ, Ex. 17. Following the meeting, Berman and Bettenberg edited the preamble to the document and, "[i]n substance, . . . recommended that the rulemaking clarify that the existing regulations already permitted DOI to employ market-based royalty assessments."  POGO IV, 525 F. Supp. 2d at 163.[4]  That clarification would benefit DOI in its litigation, but it would also benefit POGO's litigation.  See id.  After the DOJ began investigating POGO's payment to Berman, Bettenberg stated in an

---

    [4]  It is not certain that Berman and Bettenberg's meeting on oil royalty valuation issues occurred after Berman's discussion with Brian, but the preamble edits were apparently completed on December 18, 1996, well after that discussion.  See Tr. Day 3 at 17-29, 155-60; see also Gov't MSJ, Ex. 17 & Att. 1; Gov't Trial Ex. 15A (signed version of Att. 1, dated 12/18/1996).

affidavit that he did not know that Berman had any financial arrangements with POGO, and that if he had known, he "would not have allowed Mr. Berman to attend the meeting, to work on the draft memorandum, or to participate in any manner on a matter in which he had a potential financial interest."  Gov't MSJ, Ex. 17.  Berman concedes that he did not inform Bettenberg of his potential financial interest.  Tr. Day 3 at 35, 42.

Second, in August 1998, Howard Chalker, a government attorney working on the qui tam litigation, asked Berman to provide him with documents relevant to the litigation.  Berman did so on September 16, 1998, and included a cover memorandum in which he "gave [Chalker] a short discourse on my understanding about how the market worked" in an "attempt to educate him."  Tr. Day 3 at 40, 42.  Berman was concerned that Chalker was not "casting his net broadly enough" or "thinking about the problem broadly enough," and he offered to assist Chalker in evaluating the documents.  Id. at 41-42; Gov't Mot. for Post-Trial Judgment on Counts III, IV, and V [Docket 112] ("Gov't Count III Mot.") at 3; Gov't Trial Ex. 25.  Berman did not tell Mr. Chalker of his financial interest in the qui tam litigation, which was at that point memorialized in a written agreement.  Tr. Day 3 at 42.

With those undisputed facts in mind – Berman agreed to accept and did accept a payment from POGO, he did not disclose the payment to his ethics officer or anyone else at the DOI, and he completed two assigned tasks related to oil royalty valuation issues after agreeing to accept a share of the proceeds from POGO's qui tam litigation – the Court will return to the ethics regulations, which "provide evidence of the precise nature of [Berman's] fiduciary duty." Kenealy, 646 F.2d at 703.  Under 5 C.F.R. § 2635.101(b)(4), a federal employee may not "solicit or accept any gift or other item of monetary value from any person or entity seeking official

36

action from, doing business with, or conducting activities regulated by the employee's agency, or whose interests may be substantially affected by the performance or nonperformance of the employee's duties."  Moreover, 5 C.F.R. § 2635.204(d)(1) clarifies that regulation and provides that "[a]n employee may accept gifts, other than cash or an investment interest, with an aggregate market value of $200 or less if such gifts are a bona fide [public service] award." Gifts of cash and investment interests, however, may not be accepted except "upon a written determination by an agency ethics official" that the award meets certain standards.  Id.[5]

Here, Berman accepted a gift – an investment interest in POGO's qui tam litigation – informally in December 1996, and formally in January 1998.  He then accepted in November 1998 a check in the amount of $383,600 representing the proceeds of that investment interest in the qui tam litigation.  The $383,600 was only Berman's share of the first installment of the settlement proceeds; POGO received later installments, and Brian testified that the later installments would have been shared with Berman had the Justice Department not intervened. Tr. Day 2 at 16.  There is no question that POGO was "seeking official action from [or] doing business with" the Department of the Interior during this time.  Hence, Berman's conduct violated 5 C.F.R. § 2635.101(b)(4).  Moreover, it is possible that POGO's interests could have been "substantially affected by the performance or nonperformance of [Berman's] official duties."  Berman may not have had regular work on oil royalty undervaluation issues at the time he agreed to share the proceeds of POGO's litigation, but he was assigned sporadic duties relating to those issues.  Finally, Berman did not receive a written determination from his ethics official allowing him to accept the investment interest in POGO's litigation (and eventually his

---

[5] These regulations have been in effect since 1992.  See 57 Fed. Reg. 35006-01 (Aug. 2, 1992).

share of the proceeds).  The fact that POGO's counsel informed someone at the Justice

Department of the payment shortly before it was made is no defense.  Kenealy, 646 F.2d at 705

(informal disclosures are not a defense to claim of breach of fiduciary duty, and "[t]his is not

splitting hairs, [because] a disclosure deliberately responded to by an authorized superior may

rationally support a conferring of immunity while a unilateral announcement may not").  Hence,

Berman violated 5 C.F.R. § 2635.204(d)(1) as well.

Berman likely also violated 5 C.F.R. § 2635.101(d)(14), which states that "[e]mployees

shall endeavor to avoid any actions creating the appearance that they are violating the law or the

ethical standards set forth in this part."  Berman's financial interest in litigation in the DOI's

subject area, on a topic he had worked on extensively and occasionally continued to work on,

appears to create a violation of ethical standards.  Indeed, the fact that Berman failed to disclose

his interest to anyone at DOI – even after it became clear that he was likely to recover a

substantial sum from the qui tam lawsuits – suggests that he suspected the arrangement would

be perceived negatively.

Berman's failure to comply with ethics regulations indicates that he breached his

fiduciary duty by "tak[ing] any gift, gratuity, or benefit in violation of his duty, or acquir[ing]

any interest adverse to his principal, without a full disclosure."  Carter, 217 U.S. at 306.  Berman

disputes this conclusion, arguing that he did not actually "acquire any interest adverse to his

principal" because the United States and POGO were on the same side in the qui tam litigation,

but this argument is unpersuasive.  Berman Count III Opp. at 3-4.  First, Carter's test is

disjunctive: an employee can breach his fiduciary duty by "tak[ing] any gift . . . or benefit in

violation of his duty" or by "acquir[ing] any interest adverse to [the] principal."  Second, even if

the test were conjunctive, Berman first discussed sharing the proceeds of the litigation well

before the United States intervened in the litigation.  Third, "qui tam relators are different in kind

than the Government. They are motivated primarily by prospects of monetary rewards rather

than the public good."  Hughes Aircraft Co. v. United States ex tel. Schumer, 520 U.S. 939, 949

(1997).  As the government correctly explains:

> The Government's interests go beyond the pecuniary interests of recovering
> money in an individual case. These concerns include how any given litigation
> may affect policy, the operation of programs, the construction and interpretation
> of an agency's statutes and regulations, and other matters. The complexity of
> these issues is evident from the amount of debate that went on inside Interior,
> congressional hearings which aired the issues but didn't resolve them, and the
> controversy over amending the oil valuation regulation.

Reply in Supp. of Gov't Count III Mot. [Docket 118] at 8.

The Court therefore finds that, under the relevant caselaw and regulations, Berman

breached his fiduciary duty to the government by accepting an investment interest in POGO's

litigation without any disclosure at all, and eventually accepting a payment from POGO without

"full disclosure."  Carter, 217 U.S. at 306.  It is worth noting the obvious here: this is not a

situation involving a gift modestly in excess of $200, but rather an investment interest and then

cash in excess of $383,000 – a sum that would have been even larger but for the Justice

Department's investigation – about which Berman made a conscious choice not to consult with

his ethics official.  The Court will therefore grant the government's motion for summary

judgment on Count III.  As the Court has previously noted, disgorgement is the proper remedy

for a breach of fiduciary duty, and Berman must therefore disgorge the $383,600 he received

from POGO.[6]  POGO VII, 572 F. Supp. 2d at 76-77; Kearns, 595 F.2d at 733.

---

[6]  The Court reiterates that, as indicated in its prior opinion on the breach of fiduciary
duty count, it is extremely reluctant to order against Berman  both disgorgement on the fiduciary

IV.  Conclusion

For the reasons given above, Berman's summary judgment motion and Berman's motion to dismiss will be denied.  The government's motion for summary judgment will be denied as to Count I and granted as to Count III in a separate order.

_____/s/_____
John D. Bates
United States District Judge

Dated: <u>March 21, 2012</u>

---

duty count and payment of a $383,600 penalty on the § 209 count. <u>POGO VII</u>, 572 F. Supp. 2d at 75-77.